Cora GRIFFIN, Bessie Williams, and Martha Hughes, Individually and on behalf of all other persons similarly situated, Appellants,

v.

Patricia Roberts HARRIS, as Secretary of the United States Department of Housing and Urban Development, David S. Cook, as Assistant Secretary for Housing Production and Mortgage Credit and Federal Housing Commissioner, United States Department of Housing and Urban Development, and United States Department of Housing and Urban Development.

No. 77–2129.

United States Court of Appeals, Third Circuit.

Argued Nov. 28, 1977.

Decided Feb. 13, 1978.

Harold R. Berk, Stephen Bosch, George D. Gould, Community Legal Services, Inc., Philadelphia, Pa., for appellants.

David W. Marston, U. S. Atty., Walter S. Batty, Jr., Asst. U. S. Atty., Chief, App. Div., Robert S. Forster, Jr., Asst. U. S. Atty., Philadelphia, Pa., for appellees.

Before GIBBONS, VAN DUSEN, Circuit Judges, and FISHER,* District Judge.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

The appellants are low-income tenants in multifamily housing subject to a rent supplement contract between the landlord and the Department of Housing and Urban Development (HUD). They complain, on their own behalf and on behalf of all tenants similarly situated, that HUD is operating the rent supplement program illegally and to their disadvantage. HUD defends its administration of the program, claiming that it is implementing the intent of Congress. After certifying a limited class, the district court granted summary judgment in favor of HUD. We reverse.

## I. THE RENT SUPPLEMENT PROGRAM

Section 101 of the Housing and Urban Development Act of 1965 [1] established the rent supplement program. Under this program, the federal government makes rent supplement payments on behalf of certain low-income families to enable them to occupy housing units built by private nonprofit or limited, dividend corporations and financed by mortgages, bearing interest at the market rate but insured by the Federal Housing Administration. The purpose of the program is to provide decent housing for low-income persons and to stimulate investment by the private sector in urban renewal.

The Act authorizes HUD to contract with eligible landlords to make annual payments for the housing of qualified tenants for a period not exceeding forty years.[2] With such a contract in hand, a housing developer can obtain mortgage financing, even if a sufficient number of tenants who can afford to pay fair market rentals cannot be found in the area. The Act provides:

> The amount of the annual payment with respect to any dwelling unit shall not exceed the amount by which the fair market rental for such unit exceeds one-fourth of the tenant's income as determined by the Secretary [of HUD] pursuant to procedures and regulations established by him.[3]

The Act directs HUD to

> establish criteria and procedures for determining the eligibility of occupants and rental charges, including criteria and procedures with respect to periodic review of

---

* Honorable Clarkson S. Fisher, United States District Judge for the District of New Jersey, sitting by designation.

1. Pub.L.No.89–117, § 101, 79 Stat. 451 (1965), 12 U.S.C. § 1701s.

2. 12 U.S.C. § 1701s(a).

3. 12 U.S.C. § 1701s(d).

tenant incomes and periodic adjustment of rental charges.[4]

There is also a more general authorization for rule making.[5]

In the exercise of its authority, HUD has published regulations specifying eligible projects,[6] eligible housing owners,[7] and qualified tenants.[8] A regulation further specifies that

> [t]he rent supplement contract shall provide that the payment on behalf of a qualified tenant shall be that amount by which the rent approved by the [Federal Housing] Commissioner for the unit exceeds one-fourth of the tenant's income, or exceeds any welfare allowance for housing if such allowance is larger than one-fourth of the tenant's income.[9]

Thus, although 12 U.S.C. § 1701s(d) says that the supplement shall not exceed the difference between one-quarter of the tenant's income and the approved rent, the quoted regulation specifies that the full amount of that difference shall be contracted for.

Since the income of a qualified tenant is subject to change, it has always been contemplated that the amount of the supplement paid on behalf of a tenant might vary over the life of the rent supplement contract.[10] Such contracts run for the term of the mortgage or for forty years, whichever is shorter.[11] The regulations provide that an owner can obtain from HUD a certificate of eligibility for each tenant,[12] but that a recertification of income must be obtained each year,[13] and that the owner must notify HUD of any increase in a tenant's income.[14]

The purpose of these regulations is, of course, to prevent overpayment by HUD.

Appropriate adjustments will be made in rent supplement payments to reflect income changes shown by the annual tenant income recertification. Rent supplement payments will be discontinued when it is determined by the Commissioner that 25 percent of the tenant's income is sufficient to pay the full amount of the rent for the unit occupied by the tenant. Where a tenant is no longer entitled to rent supplement payments, he may continue to occupy the unit. The rent charged for the unit shall not exceed the fair market rental as determined by the Commissioner.[15]

In the absence of further regulations, payments on behalf of qualified tenants in a project would equal the difference between the approved rent and one-fourth of each tenant's income. That formula is modified, however, by two provisions: (1) regardless of a tenant's income, no certificate of eligibility shall be issued for more than 70 percent of the approved rent for the unit; and (2) no certificate shall be issued for less than 10 percent of the approved rent.[16]

The appellants in this case seek a judgment requiring HUD to make rent supplement payments on their behalf in an amount equal to 70 percent of the approved rent for the unit, whenever such payments are necessary to limit their own rent payments to 25 percent of their income. That would seem to be the correct formula under the regulations.

---

4. 12 U.S.C. § 1701s(e)(1).

5. 12 U.S.C. § 1701s(f).

6. 24 C.F.R. § 215.10.

7. 24 C.F.R. § 215.15.

8. 24 C.F.R. § 215.20.

9. 24 C.F.R. § 215.45(a).

10. *See* H.R.Rep.No.365, 89th Cong., 1st Sess., *reprinted in* [1965] U.S.Code Cong. & Admin. News pp. 2614, 2618.

11. 24 C.F.R. § 215.35.

12. 24 C.F.R. § 215.25.

13. 24 C.F.R. § 215.55 (tenants over 62 years of age excluded).

14. 24 C.F.R. § 215.75.

15. 24 C.F.R. § 215.80.

16. 24 C.F.R. § 215.25(a).

## II. THE RENT SUPPLEMENT CONTRACT

■ Despite the regulations, HUD has often contracted to pay much lower sums. For authority, it points not to the published regulations, but to its own Rent Supplement Handbook. The Handbook provides for a restrictive clause to be added to the rent supplement contract:

Only 25 percent of the tenants may receive more than 60 percent supplement. This restriction may be waived by the Regional Administrator where it can be demonstrated that by imposing this requirement, it will be difficult to secure eligible tenants for the units affected.[17]

There are standard rent supplement contracts for use between HUD and housing owners. To these standard contracts, according to HUD, the quoted 25 percent/60 percent limitation is usually added as a "Special Condition."

The purpose behind the contractual limitation on the number of tenants benefiting from a rent supplement of more than 60 percent of the approved unit rent is the achievement of a mix of tenants from different socioeconomic levels. Such a mix was certainly desired by Congress. During the debates on the Housing and Urban Development Act of 1965 and during later debates on rent supplement appropriations, several Congressmen expressed concern that the rent supplement program would produce the same result that the public housing program had produced: the concentration of low-income families.[18] During hearings on the Supplemental Appropriations Act of 1966, the Secretary of HUD, perhaps intending to allay these concerns, explained:

The program will be administered with the objective of achieving, for each rent supplement project, as wide a spread of incomes as possible. The preliminary reservation of rent supplement funds will be based on as wide a spread of incomes as seems reasonable of achievement. The housing owner will be urged to make every effort, during his renting period, to take in tenants with as wide as possible a range of economic and social characteristics. In addition, every effort will be made to encourage and assist housing owners to take in as tenants, individuals and families whose incomes make it possible for them to pay the full economic rent for their units. It is believed that such economic and social diversity will reduce management problems and expenses and also contribute to the social and economic upgrading of tenants of relatively low economic and social achievement.[19]

HUD argues that the 25 percent/60 percent contract clause is designed to achieve "as wide a spread of incomes as possible." This object is certainly commendable. Indeed, some effort to attain it—at least at the outset of a project, when the decision is made to enter into a rent supplement contract with a developer—may be required by our decision in *Shannon v. United States Department of Housing and Urban Development*, 436 F.2d 809 (3d Cir. 1970). Thus, despite the fact that no such contract clause is expressly authorized by the statute or the regulations, some such provision probably would be a valid means for achieving at the outset of a project a desirable mix of tenants. Moreover, we can understand HUD's interest in imposing upon the housing owner an ongoing obligation to make an effort to maintain such a mix.

In operation, however, the contract provision has no effect (or at best, only an indirect effect) upon the owner's selection of tenants. Because income may rise or fall, the tenant mix may change over the life of the mortgage. The financial circumstances of some tenants may improve, while the

17. Rent Supplement Handbook, HUD 4520.1, ¶ 3–6(a) (insert dated 2/74).

18. *See* Cong. Rec. H 14,611 (daily ed. June 29, 1965) (remarks of Rep. Hanna); Cong.Rec.H 9,737 (daily ed. May 10, 1966) (remarks of Rep. Gaimo).

19. Hearings on Supplemental Appropriations Bill, Before the Subcomm. of the House Comm. on Appropriations, 89th Cong., 1st Sess. 245 (1966).

circumstances of others may worsen. The income, of which 25 percent is assigned for rent, is adjusted under the regulations for medical expenses, child care, and other allowable deductions.[20] HUD does not impose a contractual obligation on the owner to evict some poor tenants when a change in circumstances causes the mix to become undesirable. Nor does it impose an obligation not to rent vacant units to poor people, even though they would be overrepresented. Instead, according to the plaintiffs, HUD achieves compliance with the contract provision by the procrustean expedient of allowing full supplementation to 25 percent of the tenants, while limiting the remaining tenants to a 60 percent supplement—even though the latter would, on an income basis alone, qualify for more. The housing owner continues to collect the full rent, the mortgagee continues to collect principal and interest, the Federal Housing Administration pays nothing on its guarantee, but some tenants—selected, so far as the record discloses, on a purely arbitrary basis—pay a higher percentage of their income in rent than do others similarly situated. They continue to reside in the project and the tendered reason for the contract provision—an appropriate income mix—remains unachieved. No one is sanctioned for the breach of the formula except the low-income tenants, who are probably least able to foresee or avoid the undesirable condition.

The gross unfairness—even irrationality—of the system in operation can be best seen, perhaps, in its impact on a tenant whose income and circumstances have not changed, but whose rent supplement is reduced because other tenants in the project have children, become ill, or lose their jobs. There is not even an incentive for the owner to evict those tenants whose circumstances have changed, since the risk of those changed circumstances is spread among the remaining 75 percent of the tenants. By reducing supplementation to those tenants, HUD automatically keeps the owner in compliance with the contract.

HUD defends the contract provision as a rational means for achieving a desirable mix of tenants because it provides an incentive to those tenants who have been penalized to move elsewhere. But nothing in the record, and nothing that occurs to us, suggests that the program works that way in practice. To accept HUD's argument, we would have to assume either that tenants whose incomes are so low that they are eligible for 70 percent rent supplementation will, when faced with a reduction to 60 percent, move to open-market housing and give up the 60 percent supplementation, or that there are sufficient vacancies in housing subject to rent supplement contracts that such tenants can locate a unit in a project satisfying the 25 percent/60 percent formula. We can make neither assumption. In short, the contract provision, as applied, has no reasonable relationship to its tendered justification.

HUD urges, however, that 12 U.S.C. § 1701s(d) sets only a maximum figure for rent supplementation and should therefore be construed as conferring discretion on the Secretary to authorize lesser amounts. We referred above to the regulation limiting supplementation to 70 percent of the approved rent, and we assume for present purposes that this regulation, uniformly applied, is a valid manifestation of whatever discretion is vested in the Secretary. But in HUD's motion for summary judgment it made no showing concerning the manner in which, in any given project, tenants are selected for inclusion in the favored 25 percent. Nothing in the statute suggests that the Secretary has discretion to pick and choose among qualified tenants on an arbitrary, irrational, *ad hoc* basis. Nothing in the statute suggests that the Secretary has discretion to provide that some qualified tenants should receive the benefit of the mandatory language of 24 C.F.R. § 215.-45(a), while others, for reasons entirely beyond their control, should not.

Indeed, the depositions and exhibits which were before the district court suggest

---

**20.** 24 C.F.R. § 215.45(b)(2).

that even the 25 percent/60 percent formula found in the Rent Supplement Handbook is not uniformly applied. In some projects the contracts provide that no more than 20 percent of the tenants may receive full supplementation. There is no explanation for this departure from the Handbook. Nothing in the statute suggests that the Secretary can pick and choose among projects on an *ad hoc* basis, rather than pursuant to published regulations consistently applied.

The district court, in granting summary judgment in favor of HUD, concluded:

> There can be no question that the Handbook policy fosters economic and social diversity in keeping with the will of Congress and its implementation is clearly within the broad statutory authority granted to the Secretary by section 101(f) [12 U.S.C. § 1701s(f)].

We cannot agree. The contract clause, to the extent that it operates to reduce rent supplements after the initial approval of the project, does not foster economic and social diversity. It merely reduces benefits to arbitrarily selected tenants. Even at the outset of the project, it permits evasion of the policy of achieving an economic mix of tenants, since it leaves the developer with an incentive to find tenants who qualify for rent subsidies, knowing that the worst that can happen will be a government guarantee of 60 percent of the rent of 75 percent of the tenants. The statute contains no authority for such arbitrary action. The summary judgment in favor of HUD cannot be affirmed on the grounds tendered by HUD and accepted by the district court.

## III. THE TENANTS' CLAIM

Although we agree with the appellants that the 25 percent/60 percent contract clause, as applied to them, is not valid under the statute and regulations, we must still inquire whether the law affords them any remedy.

 Our inquiry begins with some fundamentals of administrative law. Validly promulgated regulations have the force and effect of law.[21] Government agencies must follow their own published regulations, even when the particular decision involves some discretion.[22] Agencies may not publish regulations pursuant to the Administrative Procedure Act while at the same time producing *ad hoc,* unpublished decisions.[23]

In this case, 24 C.F.R. § 215.45(a) provides that "the payment on behalf of a qualified tenant shall be that amount by which the rent approved by the Commissioner for the unit exceeds one-fourth of the tenant's income." The only published qualification is the ceiling—70 percent of the approved rent—contained in 24 C.F.R. § 215.25(a). When HUD enters into a rent supplement contract with a housing owner, it must follow its own regulations. It is, of course, true that HUD has discretion in the selection of projects with respect to which it will enter into such contracts. There will, therefore, be many persons who, while qualifying on an income basis, will nonetheless never receive the benefit of a rent supplement contract. But those who are induced to become tenants in an approved project are among the intended beneficiaries of the statute. As to them, the benefits are a matter of statutory entitlement, not a gratuity.[24]

 Recognizing that HUD is acting unlawfully, we have no difficulty in holding that prospective injunctive relief is appropriate. With regard to retrospective adjustment of withheld benefits, we note that this court has found it to be an appropriate

**21.** *E. g., United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 265, 74 S.Ct. 499, 98 L.Ed. 681 (1954).

**22.** *E. g., Vitarelli v. Seaton,* 359 U.S. 535, 539, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); Service v. Dulles, 354 U.S. 363, 372, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957).

**23.** *E. g., Morton v. Ruiz,* 415 U.S. 199, 232, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974).

**24.** *See Goldberg v. Kelly,* 397 U.S. 254, 261–62, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *King v. Smith,* 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968).

remedy in an analogous case.[25] However, because no record was made in the district court and because HUD did not address the issue in its brief to this court, we are not able to explore all the ramifications of appropriate retrospective relief at this time. The scope of such relief is for the district court in the first instance. Therefore, we now hold only that the summary judgment in favor of HUD must be reversed.

## IV. THE CLASS CERTIFICATION

■ In their complaint the plaintiff tenants sought prospective injunctive relief for themselves and for all similarly situated tenants. In addition, they sought retrospective relief in the amount of their overpayment of rent on behalf of the class of

> all present and former tenants in the nation on whose behalf the defendants make or have made rent supplement payments since December 22, 1971 to the respective owners of multi-family housing under Section 101 of the Housing and Urban Development Act of 1965 which rent supplement payments are or were equal to or less than sixty per cent (60%) of each tenants' [sic] rent when the tenant is or was thereby required to pay more than twenty-five per cent (25%) of his/her adjusted income as rent.

In its decision the district court defined the class more restrictively:

> all tenants in the nation on whose behalf the defendants made at the commencement of this action rent supplement payments to the respective owners of multi-family housing under Section 101 of the Housing and Urban Development Act of 1965 which rent supplement payments were equal to or less than sixty percent (60%) of each tenant's rent when the tenant was thereby required to pay more than twenty-five percent (25%) of his/her adjusted income as rent.

The narrower definition excludes tenants who had left eligible housing prior to the commencement of the action.

We have already indicated that the exact nature of the retrospective relief must still be explored by the district court. In the course of that exploration the district court will obviously be free to reconsider its class certification. It will be appropriate at that time to ask whether a class which includes former tenants is sufficiently manageable.

## V. CONCLUSION

The summary judgment in favor of HUD will be reversed, and the case remanded for further proceedings.

---

**25.** *Carter v. Butz*, 479 F.2d 1084 (3d Cir.), *cert. denied,* 414 U.S. 1103, 94 S.Ct. 737, 38 L.Ed.2d 559 (1973).