Lyman T. SHEPARD,
Petitioner-Appellant,

v.

Larry TAYLOR, Warden, Metropolitan Correctional Center, and Maurice Sigler, Chairman, United States Parole Commission, Respondents-Appellees.

Nos. 1210, 1211, Dockets 77–2030, 77–2031.

United States Court of Appeals,
Second Circuit.

Argued May 9, 1977.
Decided May 27, 1977.

Phylis Skloot Bamberger, New York City (William J. Gallagher, The Legal Aid Society, Federal Defender Services Unit, and Gordon J. Johnson, New York City, of counsel), for petitioner-appellant.

Carl T. Solberg, Asst. U.S. Atty., New York City (Robert B. Fiske, Jr., U.S. Atty., S. D. N. Y. of New York City, Samuel J. Wilson, Asst. U.S. Atty., and Annette Blum, Sp. Asst. U.S. Atty., New York City, of counsel), for respondents-appellees.

Before KAUFMAN, Chief Judge, CLARK, Associate Justice * and JAMESON, District Judge.**

IRVING R. KAUFMAN, Chief Judge:

Few of our society's problems have proved as insoluble as juvenile crime. Despite numerous proposals by reformers and social scientists to rid us of the effect of deviant behavior among the young, the nagging ailment persists. Varying perceptions of the cause of the affliction and the proper antidote have impelled successive generations of experts to favor with equal fervor either lenient or harsh handling of errant minors.

The instant controversy arises out of the recent tendency to reject the so-called "rehabilitative ideal" as a relic of an earlier, more optimistic, era and to return to traditional criteria of retribution and deterrence in punishing juvenile offenders. Our task is to determine whether the appellant, who was convicted and sentenced pursuant to the Federal Youth Corrections Act in 1972 to an indeterminate term of "treatment," can now be likened to a hardened, adult criminal for purposes of parole release. We believe that the constitutional proscription against *ex post facto* laws prohibits just this sort of midstream increase in punishment and, accordingly, reverse the judgment of the district court which dismissed the appellant's petition for a writ of habeas corpus.

## FACTS

The appellant, Lyman Shepard, was sentenced on July 7, 1972 in the U.S. District Court for the Western District of Texas to an indeterminate term of imprisonment of up to six years, pursuant to the Federal Youth Corrections Act, 18 U.S.C. § 5010, for transporting a stolen car in interstate commerce, 18 U.S.C. § 2312. He was released

on parole in Florida less than two years later. In October, 1974 Shepard violated the conditions of his parole by traveling to New York City, where he subsequently was apprehended while attempting to rob a restaurant. In the course of a struggle with two detectives, a gun that the appellant was carrying discharged. No one, fortunately, was injured. Shepard pleaded guilty to attempted robbery in the second degree and, on December 17, 1974 was sentenced to four years imprisonment by the Supreme Court of New York County. A federal detainer was lodged against Shepard three weeks later.[1]

While incarcerated at the Clinton Correctional Facility Shepard made extraordinary emotional and intellectual progress. He attended classes at a local college where he distinguished himself by maintaining a straight-A average and attaining to the Dean's Honor List. Fred Woodward, the Coordinator of the Inmate Higher Education Program at Clinton, lauded Shepard's "fabulous" academic record, his eagerness to learn and exceptional motivation. S. W. Haley, the appellant's correction counselor, noted Shepard's "excellent institutional adjustment," and stated that "Lyman has undergone significant personal growth while incarcerated and has learned to direct his energies toward viable self-improvement programs." Convinced of his ability to return to society as a useful citizen, the New York authorities released Shepard on parole on December 15, 1976, after he had served only one-half of his state sentence, to facilitate his registration for full-time matriculation at Clinton Community College. A local businessman, Peter Smith, assured the Board that he would provide the parolee with a job and suitable housing.

It appeared that only the federal detainer loomed as an obstacle to a bright and productive future for the appellant. The U.S. Parole Commission scheduled a revocation

---

* Tom C. Clark, Associate Justice, United States Supreme Court, Retired, sitting by designation.

** William J. Jameson, Senior United States District Judge for the District of Montana, sitting by designation.

1. Shepard attempted to secure an immediate federal parole revocation hearing, but was rebuffed by the Supreme Court. *See Shepard v. U.S. Parole Commission,* 554 F.2d 64 (2d Cir. 1977).

hearing for January 11, 1977. Shepard, quite properly, requested the federal authorities to subpoena his state institutional records and psychiatric reports as well as to require Mr. Haley to testify concerning the appellant's maturation while in state custody so that the Commission could fully consider, as did the New York authorities, his remarkable progress toward rehabilitation and the absence of any useful purpose in reincarcerating him. The Commission, however, denied this request, and stated that the material was not required in determining whether revocation of parole was appropriate.

At the federal parole hearing, Shepard related his version of the events that culminated in his New York conviction and, in the absence of detailed documentary or oral evidence, urged that his character had improved considerably while serving his state sentence at Clinton. The appellant assured the Commission that he was prepared to begin life anew and, under the supervision of the state authorities, would pursue his degree in marine biology. The hearing examiners nevertheless decided to revoke Shepard's parole.

The panel also determined, however, to reinstate Shepard's parole in two months (March 15), a date far below the minimum term of reincarceration suggested by the Parole Commission's recently promulgated "reparole guidelines," 28 C.F.R. § 2.21, 41 Fed. Reg. 37324–25 (Sept. 3, 1976). The examiners obviously were impressed with the appellant's "outstanding" record while in state confinement and his educational plans as well as the fact that if released he would be under dual federal and state supervision; indeed, his state parole period extended beyond the maximum expiration date of Shepard's federal sentence, April 9, 1978. Without condoning the acts that constituted a parole violation, the panel considered Shepard a contrite and reformed individual. It found, moreover, that he had no prior history of violence and that the discharge of the gun was accidental.

Since the hearing examiners recommended an additional term of incarceration below that indicated by the guidelines, their determination was reviewed by the Regional Commissioner. He affirmed the panel's decision to revoke parole but rejected reparole and set November, 1977—only four months before the appellant's mandatory Federal Youth Corrections Act release date—for a routine parole hearing. The Regional Commissioner's decision stated that Shepard's parole supervision history was rated "negative" because of his poor response to federal parole supervision in Florida—nearly three years earlier—and his 1974 criminal conduct in New York, which the guidelines classified as of "greatest severity." A decision below the customary term set forth in the Commission's guidelines was warranted, however, because, it was observed, Shepard had been "continuously confined [in state prison] for 27 months with good adjustment." "Your reparole at this time," the order cryptically concluded, "would promote disrespect for the paroling process." Immediate review was sought from the National Appeals Board, which has yet to render a decision.

As far as we can discern the primary reason for Shepard's parole revocation was the severity of the state crime he committed more than two years earlier. The Government correctly contends that the hearing panel was compelled by its new reparole guidelines to afford substantial weight to the severity of the offense in determining whether to release Shepard. The hearing panel, in fact, noted that its guidelines deemed at least 48 additional months of incarceration appropriate for an individual who violated his parole by committing a crime in the course of which a firearm was discharged. That this was the "customary" range of extra imprisonment for persons with "good institutional adjustment and program progress," 28 C.F.R. § 2.19(b), 41 Fed. Reg. 32732 (Sept. 3, 1976), makes the panel's decision to mitigate the rigor of the guidelines and require only two additional months[2] from Shepard, a crucial

2. Shepard received credit from the federal authorities for the 27 months he spent in state

confinement, reducing further potential incarceration under the guidelines to 21 months. In

measure of the panel's view of his extraordinary progress in state prison.

While pressing his case before the Parole Commission Shepard had twice petitioned for habeas corpus in the Southern District. On January 27, 1977 Judge Tenney denied the appellant's first application, which challenged the propriety under *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), of the Commission's refusal to subpoena Shepard's state parole file and require the presence of correctional counselor Haley at the revocation hearing. The district court held that the complimentary statements in Haley's letter to the Commission, quoted above, assured Shepard a fair hearing and refused to find a due process violation in the Commission's failure to subpoena "duplicative" material. Judge Owen denied Shepard's second petition on February 25. By his ruling he upheld the propriety of applying the Commission's reparole guidelines to an individual originally sentenced under the Federal Youth Corrections Act. We consolidated the appeals taken by Shepard from these orders.

## DISCUSSION

 Neither we nor the parole board possess the omniscience to determine with certainty who will or will not prove to be a good parole risk. Nevertheless, the Supreme Court recently has affirmed that an individual's institutional record is one of the "most significant factors" in predicting his ability to assume his place in a free society. *Moody v. Daggett,* 429 U.S. 78, 88–90, 97 S.Ct. 274, 50 L.Ed.2d 236 (1976). And Congress, in the original Federal Youth Corrections Act, made equally explicit the elements that could *not* be considered in deciding whether to release a young offender. In this case the Commission did not perform the purely predictive function required of it

by the Youth Corrections Act as it existed at the time of Shepard's original conviction. Rather, the board applied to Shepard punitive criteria that could not have been considered at the time of his initial sentencing. Accordingly, the Commission in fact retroactively increased his term of incarceration. Putting aside the impact of the reparole guidelines on the underlying purposes of the Youth Corrections Act, cf. *United States v. Jackson,* 550 F.2d 830 (2d Cir. 1977), we believe that their application to the appellant in this case was a clear violation of the Constitution's ban on *ex post facto* laws, Art. I, § 9, cl. 3.

The Youth Corrections Act was hailed by enlightened experts as a great advance in the punishment of young offenders. The pervasive theme of the Act was the maxim that juvenile offenders would be treated differently from their adult counterparts. The sponsors of the legislation, who had fought long for their goal of separate handling of the young, sincerely believed that a proper, individualized regimen, based on England's Borstal system, would root out the antisocial tendencies that develop in adolescence and insure productive adulthood for most wayward minors. Thus the accompanying House Report praised the Act's "substitution of correctional rehabilitation for retributive punishment," 1950 U.S.Code Cong. Serv., p. 3983, and declared that "[it] departs from the mere punitive idea of dealing with criminals and looks primarily to the objective idea of rehabilitation." *Id.* at 3985. Accordingly, it was provided that a young person (under the age of twenty-two) sentenced pursuant to the Act would receive "treatment and supervision," 18 U.S.C. § 5010, and was entitled to release at any time when he was deemed prepared to reintegrate into society. Release and treatment decisions were based on reports and studies that included

addition, sentences under the Federal Youth Corrections Act run uninterruptedly from the date of conviction. Thus Shepard's term must expire on April 9, 1978, and, at the time of the revocation hearing, he could only have been imprisoned for 15 more months. The panel's

decision revoked parole but would have set the appellant free in 2 months; the superseding order of the Regional Commissioner affirmed the parole revocation, but set November, 1977, 10 months later, as the earliest possible release date.

for each offender "a mental and physical examination, to ascertain his personal traits, his capabilities, pertinent circumstances of his school, family life, any previous delinquency or criminal experience, and any mental or physical defect or other factor contributing to his delinquency." 18 U.S.C. § 5014.

The *severity* of the youthful offender's crime was conspicuously absent from the factors that could be assessed in determining whether to treat or release him. Indeed, since the concept of offense severity was relevant only in infusing the elements of general deterrence and retribution into a sentencing decision, its use would have been inimical to the Youth Corrections Act's focus on personalized "rehabilitation." In the words of the Chief Justice, "[an] important element of the program was that once a person was committed for treatment under the Act, the execution of the sentence was to fit the person, not the crime for which he was convicted." *Dorszynski v. United States,* 418 U.S. 424, 434, 94 S.Ct. 3042, 3048, 41 L.Ed.2d 855 (1974). This, of course, did not eliminate the important concern to protect the public from the rampages of youthful criminals. It did mean, however, that the decision to release a young offender had to be based on whether *he* would err again (specific deterrence of the sentenced individual) rather than on whether *others* would be more prone to commit antisocial acts if the youth were released before the expiration of his maximum term (general deterrence) or whether society had accorded the youth his "just desserts" (retribution). *See United States v. Kaylor,* 491 F.2d 1133 (2d Cir.) (en banc), *vacated for reconsideration on other grounds,* 418 U.S. 909, 94 S.Ct. 3201, 41 L.Ed.2d 1155 (1974); *United States v. Waters,* 141 U.S.App.D.C. 289, 437 F.2d 722 (1970).

■ In 1976, however, four years after the appellant's original conviction, Congress substantially revised this concept. It mandated at that time something it had opposed in 1950, consideration of the hitherto prohibited factors of general deterrence and retribution in determining whether to pa-

role (or reparole) individuals sentenced under the Youth Corrections Act. This was accomplished by amending 18 U.S.C. § 5017, the provision of the Act governing release of youthful offenders, to incorporate criteria identical to those upon which adult release decisions were based, 18 U.S.C. § 4206.

§ 4206. Parole determination criteria

(a) If an eligible prisoner has substantially observed the rules of the institution or institutions to which he has been confined, and if the Commission, upon consideration of the nature and circumstances of the offense and the history and characteristics of the prisoner, determines:

(1) that release would not depreciate the seriousness of his offense or promote disrespect for the law; and

(2) that release would not jeopardize the public welfare; subject to the provisions of subsections (b) and (c) of this section, and pursuant to guidelines promulgated by the Commission pursuant to section 4203(a)(1), such prisoner shall be released.

The legislative history makes it clear that Congress was of the view in 1976 that the Commission was to consider thereafter whether the youthful offender had received "just punishment" and was to "weigh the concepts of general and special deterrence, retribution and punishment" in all release decisions. See *Joint Explanatory Report of the Committee of Conference,* at 26, *reprinted in* 1976 U.S. Code Cong. & Admin. News, pp. 351, 358–59. Use of the Commission's parole guidelines, which purport to quantify all these congressionally mandated predictive and punitive elements, was specifically authorized and encouraged. *See id.* at 340, 346, 358–59, 368–69.

Our examination of this congressional intent removes any mystery that may have shrouded the Commission's disposition of Shepard's revocation proceeding. Close scrutiny of the "reparole guidelines" promulgated in September, 1976 discloses that it was foreordained that Shepard's parole prognosis *had* to be rated "poor", despite his splendid intervening institutional record.

This was so because the 1976 guidelines considered of the "greatest severity," 28 C.F.R. § 2.21(b)(1), (2), 41 Fed. Reg. 37324–25 (Sept. 3, 1976), Shepard's 1974 conviction. This normally requires, according to the Commission's guidelines, a period of additional imprisonment in excess of 48 months.

The inescapable conclusion is that the Commission's consideration of offense severity pursuant to the 1976 amendments operated retroactively to Shepard's serious detriment. We have little doubt that the appellant, with his fine institutional record and stable future educational and employment plans, coupled with his early state release, would not have been subjected to this severe treatment if he had been considered for parole under the criteria in existence in 1972, the year when he committed his original crime.

■ The ancient but still viable case of *Calder v. Bull,* 3 U.S. (3 Dall.) 386 1 L.Ed. 648 (1789) instructs that a law is *ex post facto* if it "changes the punishment, and inflicts greater punishment, than the law annexed to the crime when committed." *Id.* at 390. Since parole eligibility is considered an integral part of any sentence, cf. *Warden v. Marrero,* 417 U.S. 653, 663, 94 S.Ct. 2532, 41 L.Ed.2d 383 (1974), official port-sentence action that delays eligibility for supervised release runs afoul of the *ex post facto* proscription. *See Love v. Fitzharris,* 460 F.2d 382 (9th Cir. 1972), *vacated as moot,* 409 U.S. 1100, 93 S.Ct. 896, 34 L.Ed.2d 682 (1973); *Greenfield v. Scafati,* 277 F.Supp. 644 (D.Mass. 1967), *aff'd,* 390 U.S. 713, 88 S.Ct. 1409, 20 L.Ed.2d 250 (1968). This result follows even if the maximum statutory penalty for the crime remains unchanged. *See Lindsey v. Washington,* 301 U.S. 397, 57 S.Ct. 797, 81 L.Ed. 1182 (1937).

■ The expressed view of the Regional Commissioner that reparole of Shepard "would promote disrespect for the paroling process" and the substantial weight that the guidelines accord offense severity, incorporate factors that were barred from any consideration by the Act prior to amendment. Whatever our current attitude may be toward the wistful ideal of "rehabilitation," see Kaufman, Book Review, 90 Harv. L. Rev. 1052 (1977), it is unjust and offends fair play retroactively to increase the punishment of a "model prisoner" merely because of Congress's belated and changed mood concerning the proper response to juvenile crime. *Cf. Marks v. United States,* 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977).

■ We should like to emphasize the narrow scope of our holding. We cannot perceive any constitutional obstacle to rating the parole eligibility of a youthful offender who committed his crime after the 1976 amendment of the Act on the Commission's "salient factor" and offense severity grid. *Cf. Jackson, supra.* It is equally clear that the guidelines do not constitute impermissible *ex post facto* laws when applied to an adult offender since, in such an instance, they merely clarify the exercise of administrative discretion without altering any existing considerations for parole release. *See Ruip v. United States,* 555 F.2d 1331 (6th Cir. 1977). The constitutional violation we find in the instant case results from the application to a person—who would be under state supervision for two years while he attends college with a guarantee of housing and gainful employment—of new and onerous considerations that were forbidden when he was originally sentenced in 1972.

## FURTHER PROCEEDINGS

■ The illegality we have delineated in the Commission's emphasis on factors of general deterrence and retribution in revoking Shepard's parole requires an immediate new hearing. The Commission should determine whether, to use the words of the statute, Shepard "will [benefit from] further treatment in an institution or other facility." 18 U.S.C. § 5020. The standards for release will be those in existence prior to the 1976 amendment of 18 U.S.C. § 5017.

■ Moreover, since the parolee's institutional record can be one of the most significant factors in predicting his ability to live peacefully in society, *see Moody v. Daggett,*

*supra,* 429 U.S. at 88–90, 97 S.Ct. 274, we believe that the Commission should reconsider its decision not to permit Shepard to subpoena his New York State parole file and its failure to require the presence of Mr. Haley at the hearing. The appellant argues persuasively that the psychological reports in his state file are not "duplicative," *see* 1976 U.S. Code Cong. & Admin. News, p. 367, and will contradict earlier profiles compiled when he violated his federal parole.[3] Mr. Haley, Shepard contends, will supply details of the appellant's progress at Clinton and his testimony will significantly enhance the impact of the conclusory impressions recited in his letter to the Commission. We agree with the Government that neither the statute, 18 U.S.C. § 4214(a)(2)(D), nor applicable regulations, 28 C.F.R. § 2.51, 41 Fed. Reg. 37330 (Sept. 3, 1976), afford the appellant an unfettered right to "compulsory process." We, nevertheless, believe that in this unusual case any detailed evidence of institutional progress that will aid at the rehearing to predict Shepard's ability to readjust to society is relevant—indeed crucial.[4]

The judgments of the district court dismissing the petitions for a writ of habeas corpus are reversed with directions that the writ shall issue unless the U.S. Parole Commission conducts a hearing in accordance with this opinion within 14 days. The mandate shall issue forthwith.

---

3. Indeed, we are advised by appellant's counsel that the district judge made his finding of duplicativeness without even examining the state institutional record file.

4. We expect that Shepard's experience in federal detention for the past 5 months will also be helpful to the Commission. Counsel advises us that the appellant remains a model prisoner and enjoys privileges accorded only those considered minimal security risks. Of course, even this denial of freedom interferes with the appellant's pursuit of his educational goals.