UNITED STATES of America ex rel.
Lawrence FORMAN, Appellee,

v.

Cecil McCALL, Chairman, United States
Parole Commission, United States
Parole Commission, Appellant.

No. 82–3021.

United States Court of Appeals,
Third Circuit.

Argued Jan. 11, 1983.

Decided June 10, 1983.

Herbert L. Zuckerman, Sills, Beck, Cummis, Zuckerman, Radin & Tischman, Newark, N.J., Louise O. Knight (argued), Clement & Knight, Lewisburg, Pa., for appellee.

David Dart Queen, U.S. Atty., Barbara L. Kosik, Asst. U.S. Atty., Harrisburg, Pa., Henry J. Sadowski, (argued), Regional Counsel, U.S. Parole Commission, Philadelphia, Pa., for appellant.

Before WEIS, SLOVITER and BECKER, Circuit Judges.

## OPINION OF THE COURT

BECKER, Circuit Judge.

This appeal presents the question whether the application of United States Parole Commission guidelines promulgated in 1979 to an individual convicted of offenses committed between 1967 and 1974, when a prior set of guidelines was in effect, violates the ex post facto clause of the United States Constitution.[1] Subsumed within this determination is the question whether the guidelines constitute "laws" within the meaning of the ex post facto clause. The district court, relying on our opinion in *Geraghty v. United States Parole Commission*, 579 F.2d

238 (3d Cir.1978), *vacated and remanded on other grounds,* 445 U.S. 388, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980),[2] held that the guidelines constitute "laws" for ex post facto purposes and that their application in this case violated the ex post facto clause. The Parole Commission, noting the Supreme Court's vacatur of *Geraghty,* argues that *Geraghty* no longer stands as controlling precedent and that this Court should follow the other courts of appeals that have held that the guidelines do not constitute "laws."

We reject the Commission's contentions and will reaffirm *Geraghty's* holding that the retroactive application of parole guidelines *may* constitute a violation of the ex post facto clause. *Geraghty* did not definitively decide the matter, however, because we there regarded as a *factual* issue the predicate question whether, in terms of the Parole Commission's actual practice, the guidelines have the effect of "laws" on the Commission's decisionmaking or whether they constitute mere guideposts facilitating the exercise of the Commission's discretion to establish presumptive parole dates for incarcerated offenders. We therefore remanded in *Geraghty* so that the district court could make the requisite findings of fact as to the operation of the guidelines. In reaffirming *Geraghty,* we again adopt that approach. Because the district court, notwithstanding its reliance on *Geraghty,* did not make findings as to the role of discretion in decisionmaking under the guidelines, we will vacate the judgment of the district court and remand the case so that such findings may be made.

I. *Factual and Procedural Background*

Appellee Lawrence Forman and his associate Lester Genser were, from 1957 until early 1973, the president and vice president,

---

1. "No Bill of Attainder or ex post facto Law shall be passed." U.S. Const. art. I, § 9, cl. 3; *cf. id.,* art. I, § 10, cl. 1 ("No State shall ... pass any Bill of Attainder [or] ex post facto Law").

2. The vacatur and remand in *Geraghty* concerned questions relating to mootness and to maintenance of a class action. The Supreme Court held that a class action does not become

moot upon expiration of the named plaintiff's substantive claim even though such expiration occurred before the granting of class certification. The Court expressly declined to reach the merits of the ex post facto claim. 445 U.S. at 408, 100 S.Ct. at 1214; *see also United States v. Addonizio,* 442 U.S. 178, 184, 99 S.Ct. 2235, 2239, 60 L.Ed.2d 805 (1979).

respectively, of Genser-Forman, Inc., which was at the time the sole distributor in the northeastern United States of Triumph automobiles and parts for British Leyland Motors, Inc. On April 13, 1976, a federal grand jury indicted Forman and Genser for violating 18 U.S.C. § 371 (1976) and 26 U.S.C. §§ 7201 and 7206(1) (1976) (amended 1982). The indictment alleged that the two men had conspired to evade, and did evade, more than $2,000,000 in corporate and personal income tax by subscribing to tax returns that understated both gross corporate profits and personal income. On September 30, 1976, a jury returned a verdict of guilty on all counts of the indictment; on November 11, 1976, the trial judge sentenced Forman and Genser [3] each to an eight-year "regular adult" term of imprisonment.

This Court affirmed the convictions, *United States v. Genser,* 582 F.2d 292 (3d Cir.1978); 595 F.2d 146 (3d Cir.1979); 602 F.2d 69 (3d Cir.), *cert. denied,* 444 U.S. 928, 100 S.Ct. 269, 62 L.Ed.2d 185 (1979), and Forman entered Allenwood Federal Prison Camp on November 5, 1979.

On February 5, 1980, Forman received his initial parole hearing, the purpose of which was to determine his "presumptive release date," i.e., the date on which Forman presumably would be released on parole from Allenwood.[4] To make this prediction, the Parole Commission applied its Adult Guidelines for Parole Decisionmaking ("parole guidelines") promulgated in 1979, *see* 28 C.F.R. § 2.20 (1979),[5] and eventually set November 5, 1982—thirty-six months from the date on which Forman entered prison—

**3.** Genser is not involved in this appeal.

**4.** We speak in terms of presumptions and probabilities because the Commission is not obliged under all circumstances to release an inmate on the date it initially sets. 18 U.S.C. § 4206(a) (1976) provides:

> If an eligible prisoner has substantially observed the rules of the institution or institutions to which he has been confined, and if the Commission, upon consideration of the nature and circumstances of the offense and the history and characteristics of the prisoner, determines:
> (1) that release would not depreciate the seriousness of his offense or promote disrespect for the law; and
> (2) that release would not jeopardize the public welfare;
> subject to the provisions of subsections (b) and (c) of this section, and pursuant to guidelines promulgated by the Commission pursuant to section 4203(a)(1), such prisoner shall be released.

*Accord* 28 C.F.R. § 2.12(d) (1982) ("presumptive parole date shall be contingent upon an affirmative finding by the Commission that the prisoner has a continued record of good conduct"). The guidelines themselves state that "[t]he time ranges specified by the guidelines are established specifically for cases with good institutional adjustment and program progress." 28 C.F.R. § 2.20(b) (1979); *accord id.* § 2.20(b) (1982); *id.* § 2.20(b) (1974).

**5.** The parole-guidelines scheme has been the subject of much comment and discussion, *see, e.g., Campbell v. United States Parole Comm'n,* 704 F.2d 106, 111–12 (3d Cir.1983); *Warren v. United States Parole Comm'n,* 659 F.2d 183, 189–93 (D.C.Cir.1981), *cert. denied,* 455 U.S.

950, 102 S.Ct. 1454, 71 L.Ed.2d 665 (1982); *Priore v. Nelson,* 626 F.2d 211, 213–15 (2d Cir. 1980); *Geraghty v. United States Parole Comm'n, supra,* 579 F.2d at 241–42, 254–63; Project, *Parole Release Decisionmaking and the Sentencing Process,* 84 Yale L.J. 810, 817–41 (1975); Note, *Application of the Federal Parole Guidelines to Certain Prisoners: An Ex Post Facto Violation,* 62 B.U.L.Rev. 515, 518–23 (1982), and we will discuss the guidelines further, *see infra* Part IIIA.

Briefly stated: the guidelines constitute a grid on which offense severity is plotted against "offender characteristics," yielding a "customary range" of imprisonment. The offense-severity "axis" of the 1979 grid is divided into seven categories, ranging from "low" through "Greatest II." The "offender-characteristics" axis is intended to predict, by means of a "salient-factor score," "the likelihood that an inmate will succeed on parole," Project, *supra,* at 824 (footnote omitted). The salient-factor score (in 1979) was the sum of "points" assigned on the basis of the inmate's history, with reference to his number of prior convictions and commitments; his age at the time of the offense leading to his first commitment; whether the commitment offense involved auto theft or checks; whether the inmate ever had had his parole revoked or had been committed for a new offense while on parole; whether the inmate had a "history of heroin or opiate dependence"; and whether the inmate had a record of "[v]erified employment (or full-time school attendance) for a total of at least 6 months during the last 2 years in the community." The parole guidelines currently are in effect under the authorization of § 4203 of the Parole Commission and Reorganization Act, 18 U.S.C. § 4203(a)(1) (1976).

as his presumptive parole date. The Regional Commissioner also sent to Forman a Notice of Action, dated February 27, 1980, which stated:

> Your offense behavior has been rated as Greatest I severity because the amount of tax liability exceeded $500,000. You have a salient factor score of 11. You have been in custody a total of 3 months. Guidelines established by the commission for adult cases which consider the above factors indicate a range of 40–52 months to be served before release for cases with good institutional program performance and adjustment. After review of all relevant factors and information presented, a decision below the guidelines appears warranted because: the following circumstances are present: You have already repaid the government the outstanding taxes and penalty representing triple damages and in addition have satisfied your committed fine.

Forman appealed the decision to the Commission's National Appeals Board, which upheld the Regional Commissioner on October 7, 1980.

On April 29, 1981, Forman filed a petition in the District Court for the Middle District of Pennsylvania for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 (1976). The petition raised the claim, inter alia, that the Parole Commission had violated the ex post facto clause in using the 1979 parole guidelines instead of those in effect at the time

of Forman's sentencing in November 1976.[6] *United States ex rel. Forman v. McCall,* No. 81–0553, slip op. at 1 (M.D.Pa. Oct. 9, 1981). The matter initially was referred to a United States Magistrate, who recommended that the writ of habeas corpus be denied. *United States ex rel. Forman v. McCall,* No. 81–0553 (M.D.Pa. June 30, 1981) (Report of Magistrate). The district judge, however, rejected the magistrate's ruling, held that the application of the 1979 guidelines to Forman violated the ex post facto clause, and ordered the Commission to afford Forman a new parole hearing to be conducted in accordance with the guidelines in effect at the time of the 1976 sentencing.[7]

■ On November 30, 1981, Forman received the new parole hearing ordered by the district court. After several levels of administrative review, the National Appeals Board advanced Forman's presumptive release date from November 5, 1982, to June 25, 1982, thereby reducing the time to be served from thirty-six to approximately thirty-two months.[8] Forman was released on parole from Allenwood as scheduled, on June 25, 1982, after signing a Certificate of Parole noting that the early release was being granted solely to comply with the district court's order. The Certificate reserved to the Commission the right to reincarcerate Forman should this Court reverse or vacate the district court's judgment.[9]

---

6. The other issues in Forman's petition were not reached by the district court and are not now before us.

7. The Parole Commission filed a notice of appeal on December 8, 1981, and the appeal was docketed in this Court on January 22, 1982. We stayed the proceedings on March 15, 1982, pending appeals within the Parole Commission and further rulings by the district court. The stay was dissolved on August 25, 1982.

8. The new Notice of Action stated:
 > Your offense behavior has been rated as Greatest severity because it involved over $1,000,000 in evaded income taxes. Your salient factor score is 11. You have been in custody a total of 28 months. Guidelines established by the Commission for adult cases which consider the above factors indicate a minimum of 36 months to be served before release for cases with good institution-

al program performance and adjustment. After review of all relevant factors and information presented, a decision below the guidelines appears warranted because the following circumstances are present: You have already repaid the Government the outstanding taxes and penalty representing triple damages and, in addition, have satisfied your committed fine.

9. The Certificate of Parole, dated May 12, 1982, bore the legend:
 > THIS PAROLE IS GRANTED SOLELY TO COMPLY WITH THE OCTOBER 9, 1981 ORDER OF THE UNITED STATES DISTRICT COURT IN *U.S. EX REL. LAWRENCE FORMAN V. MCCALL,* CIVIL NO. 81–0553 (M.D. PA.), AND IS NOT THE RESULT OF A DISCRETIONARY DECISION UNDER THE NORMAL PROCEDURE OF THE PAROLE COMMISSION. THE COMMISSION RE-

The Commission has appealed from the district court's judgment, contending (1) that the court erred as a matter of law in selecting the date of sentencing, rather than the date of the offense, as the focal point of ex post facto analysis, and (2) that the ex post facto clause does not bar the application to a convicted offender of parole guidelines promulgated after the date of the relevant offense. We address these contentions in turn.

II. *The Focal Point of Ex Post Facto Analysis: Date of Sentencing or Date of Offense?*

■ It is a fundamental principle of ex post facto jurisprudence that a court entertaining an ex post facto claim must focus upon the law in effect at the time of the *offense* for which a person is being punished. *See, e.g., Weaver v. Graham,* 450 U.S. 24, 25, 101 S.Ct. 960, 962, 67 L.Ed.2d 17 (1981); *Welsh v. Mizell,* 668 F.2d 328, 330 (7th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 235, 74 L.Ed.2d 186 (1982); *Hayward v. United States Parole Commission,* 659 F.2d 857, 862 (8th Cir.1981), *cert. denied,* 456 U.S. 935, 102 S.Ct. 1991, 72 L.Ed.2d 454 (1982); *Rodriguez v. United States Parole Commission,* 594 F.2d 170, 175 n. 6 (7th Cir.1979). Indeed, to the extent that the prohibition against ex post facto laws represents the vehicle by which "the Framers sought to assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed," *Weaver v. Graham, supra,* 450 U.S. at 28–29, 101 S.Ct. at 963–964, the clause can fulfill its meaning and purpose only if a court looks to the law in effect at the time the actor committed the act now being punished.

■ We therefore reject the argument that, because parole eligibility might effectively be determined at the time of sentencing, *see* 18 U.S.C. § 4205 (1976), the sentencing date should be the focal point for ex post facto analysis; accordingly, we will discuss Forman's ex post facto claim in terms of the parole scheme in effect at the time of his offense. The indictment, returned in 1976, charged Forman with participating in a conspiracy "[f]rom at least as early as January 1, 1967 ... up to the date of the filing of this indictment," *United States v. Genser,* No. 76–146 (D.N.J. April 13, 1976) (Indictment, Count I, ¶ 4), and alleged as one overt act a conversation that took place "[o]n or about October 27, 1974," *id.,* Count I, ¶ 21. (Forman was convicted on Count I.) It thus appears that Forman's offense was not completed until at least October 1974, well into the era of the parole guidelines, which first were promulgated nationwide on November 19, 1973, *see* 28 C.F.R. § 2.52, 38 Fed.Reg. 31942, 31945 (Nov. 19, 1973). The proper comparison, therefore, is between the 1974[10] and the

SERVES THE RIGHT TO VOID THIS PAROLE GRANT IF THE ORDER BY THE DISTRICT COURT IS REVERSED OR VACATED ON APPEAL.

It thus appears that, but for the district court's ruling, Forman would have remained at Allenwood for an additional four months. Moreover, the Commission expressly has reserved the right to require Forman to serve out his original term should this Court reverse or vacate the district court's judgment. Accordingly, the Commission's good-faith compliance with the district court's mandate and its decision to release Forman from Allenwood do not render this case moot. *See Campbell v. United States Parole Comm'n, supra* note 5, 704 F.2d at 109 n. 2; *Gill v. Garrison,* 675 F.2d 599, 600–01 (4th Cir.1982); *United States ex rel. Goldberg v. Warden,* 622 F.2d 60, 63 n. 3 (3d Cir.), *cert. denied,* 449 U.S. 871, 101 S.Ct. 210, 66 L.Ed.2d 91 (1980).

10. Forman's offense was not completed until at least October 1974. Because the guidelines in effect between April 1974, *see* 28 C.F.R. § 2.20 (1974), and Forman's indictment in April 1976, *see* 28 C.F.R. § 2.20 (1976); *id.* § 2.20 (1975), accorded almost identical treatment to tax-evasion offenses, *see infra* note 15, we will discuss only the 1974 guidelines and treat those regulations as having been in effect at the time Forman committed his offense. This similarity among the various guidelines makes it unnecessary for us to assign a precise date to Forman's offense. The written and oral submissions of the parties presented this case as one requiring selection among the 1973, 1976, and 1979 guidelines. No mention was made of the existence of the 1974 guidelines. While, for purposes of this case, there is no significant difference between the 1973 and 1974 guidelines, we are compelled by ex post facto principles to apply the latter.

1979 guidelines, rather than between the 1976 and 1979 guidelines.[11]

### III. The Parole Guidelines and the Ex Post Facto Clause

 Having established the 1974 guidelines as the appropriate focus for ex post facto purposes, we now turn to the ex post facto question itself. As the Supreme Court held almost sixty years ago:

It is settled, by decisions of this Court so well known that their citation may be dispensed with, that any statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as ex post facto. The constitutional prohibition and the judicial interpretation of it rest upon the notion that laws, whatever their form, which purport to make innocent acts criminal after the event, or to aggravate an offense, are harsh and oppressive, and that the criminal quality attributable to an act, either by the legal definition of the offense or by the nature or amount of the punishment imposed for its commission, should not be altered by legislative enactment, after the fact, to the disadvantage of the accused.

Beazell v. Ohio, 269 U.S. 167, 169–70, 46 S.Ct. 68, 69, 70 L.Ed. 216 (1925); accord Weaver v. Graham, supra, 450 U.S. at 28, 101 S.Ct. at 963; Dobbert v. Florida, 432 U.S. 282, 292, 97 S.Ct. 2290, 2297, 53 L.Ed.2d 344 (1977). The Supreme Court recently enunciated the "two critical elements [that] must be present for a criminal or penal law to be ex post facto: it must be retrospective, that is, it must apply to events occur-

ring before its enactment, and it must disadvantage the offender affected by it." Weaver v. Graham, supra, 450 U.S. at 29, 101 S.Ct. at 964 (footnotes omitted).

In other words, whether the Parole Commission's use of the 1979 instead of the 1974 parole guidelines constituted a violation of the ex post facto clause turns on the question whether the Commission applied a "law" that "change[d] the punishment, and inflict[ed] a greater punishment, than the law annexed to the crime, when committed." Calder v. Bull, 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648 (1798). As a preliminary matter, we therefore will describe the 1979 guidelines as applied to Forman and show that Forman would have been subjected to a different—and more favorable—standard of evaluation under the 1974 guidelines. Because we agree with the district court's conclusions that the 1979 guidelines were applied retrospectively and that Forman was disadvantaged by such application, we then will proceed to the remaining question whether the guidelines constitute "laws" for ex post facto purposes.

### A. Differences Between the 1974 and 1979 Guidelines: Retrospectivity and Detriment

The parole guidelines comprise a grid on which "offense characteristics" are plotted against "offender characteristics" to yield a "customary" range of time that the offender is to serve before being released from prison on parole. See supra note 5. First promulgated nationwide in November 1973, 28 C.F.R. § 2.52, 38 Fed.Reg. 31942, 31945 (Nov. 19, 1973), the guidelines were revised in 1974, 28 C.F.R. § 2.20 (1974); in 1976, 28 C.F.R. § 2.20, 41 Fed.Reg. 37322–24 (Sept. 3, 1976); and again in 1979, 28 C.F.R. § 2.20 (1979). See also id. § 2.20 (1982). The

---

11. We acknowledge that language in prior opinions of this Court in parole-guidelines cases might suggest that the date of sentencing to be the appropriate point of scrutiny for ex post facto purposes. See United States v. Ferri, 652 F.2d 325, 327–28 (3d Cir.1981); Geraghty v. United States Parole Comm'n, supra, 579 F.2d at 263, 266. In neither of these cases, however, were we required to choose between the date

of the offense and the date of sentencing as the relevant date. Nor was this distinction at issue in Portley v. Grossman, 444 U.S. 1311, 1312, 100 S.Ct. 714, 62 L.Ed.2d 723 (Rehnquist, Circuit Justice, 1980); Priore v. Nelson, supra note 5, 626 F.2d at 217; or Zeidman v. United States Parole Comm'n, 593 F.2d 806, 808 (7th Cir. 1979).

post-1973 revisions effected no significant change in calculating salient-factor scores (i.e., "offender characteristics"): Forman received a score of eleven under the 1979 guidelines, and he would have been assigned the same score under the 1974 guidelines.[12] The revisions, however, did significantly alter the guidelines' offense-severity classifications as well as presumptive incarceration periods.

Forman was convicted of evading more than $2,000,000 in income taxes. Under the 1979 guidelines, offense severity depended upon the magnitude of the tax evasion,[13] but the guidelines did not specifically address evasions of more than $500,000: evasion of $100,000 to $500,000 was rated "Very High" and warranted (assuming a salient-factor score of eleven) a presumptive incarceration period of twenty-four to thirty-six months. In determining Forman's presumptive release date pursuant to the 1979 guidelines, the Commission therefore extrapolated[14] and raised the offense-severity rating to "Greatest I" (the catego-ry above "Very High"), which presumptively provided for forty to fifty-two months in prison.

The 1974 guidelines, by contrast, subdivided tax-evasion offenses into only two categories, rating evasion of less than $3,000 as "Low Moderate" and evasion of $3,000 to $50,000 as "Moderate."[15] Had the Commission worked within the framework of the 1974 guidelines, therefore, it could have rated the severity of Forman's offense as "Moderate," a classification that would have resulted in a twelve- to sixteen-month period of incarceration. However, we presume that the Commission could have rated the evasion of more than $2,000,000 in a higher category[16] such as "High" (a rating that could have resulted in release within sixteen to twenty months), "Very High" (which brought a presumptive incarceration period of twenty-six to thirty-six months), or even "Greatest." The 1974 guidelines established no specific range for a rating of "Greatest," but the presumptive minimum,

12. We can assume that Forman's score would have been eleven under the 1974 guidelines because that was the score assigned to him when he was reevaluated by the Commission under the 1976 guidelines, which contained a salient-factor score scheme identical to that used in 1974.

13. The 1979 guidelines established customary ranges of incarceration of six months for evasion of less than $2,000; of 10 to 14 months for evasion of $2,000 to $19,999; of 14 to 20 months for evasion of $20,000 to $100,000; and of 24 to 36 months for evasion of $100,000 to $500,000. This scheme represented a refinement of the 1976 guidelines, which had subdivided tax-evasion offenses into only two categories: evasion of less than $10,000 in taxes had resulted in a presumptive incarceration period of eight to 12 months (again assuming a salient-factor score of 11), while evasion of $10,000 to $50,000 had brought 12 to 16 months in prison. Thus, an offender who had evaded, for example, $50,000 in income taxes could have expected to serve 12 to 16 months in prison under the 1974 and 1976 guidelines, see infra, and 14 to 20 months under the 1979 guidelines.

14. The guidelines expressly state that, "[i]f an offense behavior is not listed above, the proper category may be obtained by comparing the severity of the offense behavior with those of similar offense behaviors listed." 28 U.S.C.

§ 2.20 (1979) (Note B following guidelines table). The 1976 and 1974 regulations contained equivalent instructions. Accord 28 C.F.R. § 2.20 (1982) (Note B following guidelines table).

15. Minor changes were made in the subsequent guidelines predating the 1976 revision relied upon by the district court. See 28 C.F.R. § 2.20 (1975) (classifying evasion of less than $10,000 as "Low Moderate" and evasion of $10,000 to $50,000 as "Moderate"); id. § 2.20 (1976) (same). In every case, the presumptive incarceration period for "Low Moderate" was eight to 12 months and, for "Moderate," 12 to 16 months. Accord 28 C.F.R. § 2.20 (1974); id. § 2.20 (1975); id. § 2.20 (1976).

16. See supra note 14; 28 C.F.R. § 2.20(d) (1974) ("The guidelines contain examples of offense behaviors for each severity level. However, especially mitigating or aggravating circumstances in a particular case may justify a decision or a severity rating different from that listed."); accord id. § 2.20(d) (1979); id. § 2.20(d) (1982). The available higher categories were "High"; "Very High," within which category fell most of the offenses designated in the 1979 guidelines as "Greatest I"; or even "Greatest," within which category the Commission placed Forman's offense when it reconsidered Forman's parole prognosis under the 1976 guidelines pursuant to the district court's order.

we assume, would have been thirty-six months, the upper bound of the "Very High" rating.

It thus appears that the Commission's application of the 1979 instead of the 1974 guidelines resulted in the establishment of a different "customary" range of incarceration in Forman's case: under the 1979 guidelines, Forman's worst-case prognosis was forty to fifty-two months, as compared with a thirty-six month worst-case presumptive minimum under the 1974 guidelines. Moreover, Forman's best-case prognosis was twenty-four to thirty-six months under the 1979 guidelines but twelve to sixteen months under the 1974 guidelines. We acknowledge that the Commission originally elected to go "below" the 1979 guidelines in setting a presumptive release date after thirty-six (instead of forty to fifty-two) months. When it applied the 1976 guidelines, which established a thirty-six month minimum period of incarceration, the Commission again went "below" the guidelines and released Forman after thirty-two months. But these decisions to go "below" the guidelines do not vitiate Forman's "detriment" claim, for "the *ex post facto* clause looks to the standard of punishment prescribed by a ["law"], rather than to the sentence actually imposed.... It is for this reason that an increase in the possible penalty is *ex post facto*, ... regardless of the length of the sentence actually imposed...." *Lindsey v. Washington,* 301 U.S. 397, 401, 57 S.Ct. 797, 799, 81 L.Ed. 1182 (1937); *accord Dobbert v. Florida, supra,* 432 U.S. at 299–300, 97 S.Ct. at 2301; *Geraghty v. United States Parole Commission, supra,* 579 F.2d at 264 ("The test is not whether the punishment actually received is within the outer limits of the law at the time the crime was committed, but whether 'the later standard of punishment is more onerous than the earlier.'") (footnote omitted) (quoting *Lindsey v. Washington, supra,*

301 U.S. at 400, 57 S.Ct. at 798). The later standard here is plainly more onerous.

We therefore agree with the district court that the 1979 guidelines were applied retrospectively and that such application worked to Forman's disadvantage. *See Weaver v. Graham, supra,* 450 U.S. at 29, 101 S.Ct. at 964 (formulating two-part test).

### B. *Are the Guidelines "Laws"?*

■ We next must consider whether the parole guidelines constitute "laws" within the meaning of the ex post facto clause. We note at the outset that the fact that the guidelines are administrative regulations rather than statutes does not preclude their being "laws" for ex post facto purposes, for it is a fundamental principle of administrative law that "[v]alidly promulgated regulations have the force and effect of law," *Griffin v. Harris,* 571 F.2d 767, 772 (3d Cir.1978) (footnote omitted). As the Seventh Circuit has declared: "When Congress has delegated to an agency the authority to make a rule instead of making the rule itself, the resulting administrative rule is an extension of the statute for purposes of the [ex post facto] clause." *Rodriguez v. United States Parole Commission, supra,* 594 F.2d at 173. If, then,

the legislature could not retroactively, without offending the *ex post facto* clause of the Constitution, substantially decrease parole eligibility by legislation[,] ... a similar prohibition applies to an increase in punishment brought about by rule-making, the administrative equivalent of legislation. The legislature cannot, by delegation, escape constitutional limitations on its power.

*Geraghty v. United States Parole Commission, supra,* 579 F.2d at 266 (footnote omitted). It therefore is no answer to say that the parole guidelines are not "laws" because they are merely administrative regulations.[17]

---

17. Administrative regulations come, of course, in several varieties, and those that constitute no more than general statements of policy, interpretive rules, or rules relating to agency practice or procedure might well be outside the sphere of "laws" with which the ex post facto

clause is concerned. We do not believe, however, that the parole guidelines fall within that possibly excluded class. *See Pickus v. United States Bd. of Parole,* 507 F.2d 1107, 1112–14 (D.C.Cir.1974) (rejecting contention that guidelines are merely statements of general policy

The Parole Commission nevertheless argues that several considerations preclude the characterization of the guidelines as "laws" for ex post facto purposes. First, the Commission contends that the guidelines are mere "guideposts" that facilitate the exercise of the Commission's discretion to establish presumptive parole dates for convicted offenders. Central to the Commission's case is 18 U.S.C. § 4206(c) (1976), which states:

> The Commission may grant or deny release on parole notwithstanding the guidelines . . . if it determines there is good cause for so doing: *Provided,* That the prisoner is furnished written notice stating with particularity the reasons for its determination, including a summary of the information relied upon.

The Commission asserts that it does in fact engage in individualized analysis of the parole prospects of each and every offender, using the discretion it retains to render decisions "above" and "below" the guidelines. Thus, argues the Commission, the guidelines cannot have the binding effect of "laws" because the Commission can and does set periods of incarceration "above" or "below" the ranges suggested in the guidelines—as it did in Forman's case, *see supra* —and, therefore, no person can formulate any protectible expectations with respect to presumptive release dates because too many unquantifiable and discretionary variables enter into the Commission's ultimate decisionmaking.

The Commission also claims that Forman was on notice of possible changes in the guidelines because the Commission always has expressly reserved the right to "review the guidelines periodically and [to] revise or modify them at any time as deemed appropriate." 28 C.F.R. § 2.20(f) (1974); *accord id.* § 2.20(g) (1979); *id.* § 2.20(g) (1982). Finally, the Commission relies on decisions of other courts that have found the guidelines "not [to] constitute impermissible *ex post facto* laws [because] they merely clarify the exercise of administrative discretion without altering any existing considerations for parole release," *Shepard v. Taylor,* 556 F.2d 648, 654 (2d Cir.1977). *See Stroud v. United States Parole Commission,* 668 F.2d 843, 847 (5th Cir.1982); *Warren v. United States Parole Commission, supra* note 5, 659 F.2d at 192–97; *Priore v. Nelson, supra* note 5, 626 F.2d at 217; *Portley v. Grossman,* 605 F.2d 563 (9th Cir.1979), *vacated and remanded,* 450 U.S. 962, 101 S.Ct. 1476, 67 L.Ed.2d 611 (1981); *Zeidman v. United States Parole Commission, supra* note 11, 593 F.2d at 808; *Leaphart v. Benson,* No. 78–1340, slip op. at 4–5 (10th Cir. Feb. 20, 1979); *Rifai v. United States Parole Commission,* 586 F.2d 695, 698–99 (9th Cir.1978); *Ruip v. United States,* 555 F.2d 1331, 1335–36 (6th Cir.1977).[18] *But cf.* Note, *supra*

and holding their promulgation to be subject to rulemaking provisions of Administrative Procedure Act).

18. *Warren, Portley, Rifai,* and *Ruip, supra,* can be distinguished on their facts from the case before us. In each of those four cases, the convicted offender committed the relevant offense at a time prior to the formal adoption of the first set of parole guidelines in November 1973. During the pre-guidelines era, incarcerated convicts remained in prison at the discretion of the United States Board of Parole (the Parole Commission's predecessor agency); the subsequent promulgation of structured guidelines thus might be viewed as nothing more than one possible way of exercising that discretion. Indeed, the *Warren* court relied on the fact that Warren's offense had predated the 1973 guidelines. 659 F.2d at 195–96; *see also Hayward v. United States Parole Comm'n, supra,* 659 F.2d at 862 (declining to reach question whether parole guidelines are laws be-

cause "the law at the time the crime was committed did not give the defendant any expectation of any particular parole system," and defendant therefore had no ex post facto claim).

Forman, by contrast, completed his offense *after* the promulgation of the guidelines, and his expectations thus are a function of the guidelines scheme. *Warren, Portley, Rifai,* and *Ruip,* therefore, may be read as addressing a different situation. While it is true that *Geraghty v. United States Parole Comm'n, supra,* also involved offenses committed prior to the promulgation of the guidelines, we need not here formally reaffirm *Geraghty's* treatment of pre-guidelines offenses both because the case before us involves a post-guidelines offense and because our decision does not depend on our distinguishing *Warren, Portley, Rifai,* and *Ruip.*

note 5 (arguing that retrospective application of guidelines violates ex post facto clause).

To the extent that the Commission argues, and other circuits have held, that the parole guidelines cannot be considered "laws," we reject that proposition, for, even assuming *arguendo* that the Commission can and does accord individualized treatment to each inmate, such procedures would not necessarily be dispositive of the ex post facto issue. Rather, we must focus on the range and contours of that allegedly individualized treatment. As *Geraghty* explained: while the guidelines scheme does leave room for some exercise of discretion, that discretion nevertheless appears to be constricted by the framework of the guidelines. 579 F.2d at 266–67. Unbounded discretion probably does not exist in the Commission's decisionmaking; the guidelines provide perimeters that may be overstepped only upon a showing of good cause, *see* 18 U.S.C. § 4206(c) (1976), and changes in the guidelines appear to shape the exercise of that discretion.[19] Indeed, the District of Columbia Circuit noted in *Pickus v. United States Board of Parole, supra* note 17, 507 F.2d at 1113 (footnote omitted),[20] that

> the rules which define parole selection criteria, new and old, are substantive agency action, for they define a fairly tight framework to circumscribe the Board's statutorily broad power.
>
> ... [T]hey are self imposed controls over the manner and circumstances in which the agency will exercise its plenary power. They have the effect of law....

Addressing the same questions in *Geraghty,* this Court declared:

> It appears ... that the guidelines are designed to be not mere hortatory "clarifications" of policy, but rules which are to be followed except for "substantial reason" to the contrary. The freedom of the Commission to grant parole prior to the customary release date is constrained, and the "situation" of prisoners otherwise eligible for parole is "altered to their disadvantage."
>
> The *ex post facto* clause ... reaches beyond mere formal alterations in criminal law. Thus, *if* in practice the parole authorities found good cause to deviate from the guidelines in 60% of the cases, for example, it might be argued that their discretion is, in fact, unfettered. However, the material which we have before us points in the opposite direction. The Parole Commission's answer to the complaint in this case admits that in 1975 prisoners were granted parole prior to their "customary release dates" in only 8.7% of the cases. Another decision of this Court took judicial notice of estimates of compliance with the guidelines ranging from 88% to 94%. It thus appears that the "channel for discretion" provided by the guidelines is in actuality an unyielding conduit.

579 F.2d at 267 (emphasis added) (footnotes omitted).[21] We therefore declined to follow *Shepard v. Taylor, supra,* and *Ruip v. United States Parole Commission, supra,* which

---

**19.** This very case illustrates the ratchet-like effect that changes in the guidelines appear to have on agency decisionmaking: when using the 1979 guidelines, which called for a 40- to 52-month period of incarceration, the Commission elected to go four months "below" the guidelines, to 36 months; when using the 1976 guidelines, however, which called for a 36-month minimum period, the Commission again set a term four months "below" the guidelines and released Forman after only 32 months' imprisonment. *See supra* Part IIIA. Other sources also support the conclusion that the Commission feels constrained to operate within the guidelines. *See, e.g.,* Project, *supra* note 5, at 868 n. 290.

**20.** As we stated in *Geraghty, supra,* Congress "explicitly approved 'the principles established in *Pickus'* with regard to the nature of the guidelines." 579 F.2d at 267 (footnote omitted) (quoting H.Conf.Rep. No. 838, 94th Cong., 2d Sess. 36, *reprinted in* 1976 U.S.Code Cong. & Admin.News 368).

**21.** Other cases also have noted the rigidity with which the Parole Commission usually applies the guidelines. *See, e.g., Kills Crow v. United States,* 555 F.2d 183, 186 (8th Cir.1977); *United States v. Salerno,* 538 F.2d 1005, 1007 (3d Cir. 1976); *Kortness v. United States,* 514 F.2d 167, 169–70 (8th Cir.1975).

**862**

had held the guidelines not to be "laws" for ex post facto purposes. 579 F.2d at 266.

█ Notwithstanding *Geraghty*'s vacatur on other grounds and the fact that its holding represents the minority position in the federal appellate courts, *see supra, Geraghty* appears to have retained its vitality as the law of this Circuit, *see United States v. Ferri, supra* note 11, 652 F.2d at 327–28; *United States ex rel. Goldberg v. Warden, supra* note 9, 622 F.2d at 65. However, to the extent that the vacatur may still be said to have undermined its force as binding precedent, we now reaffirm *Geraghty*'s holding and adopt its reasoning as our own.[22] We therefore hold that, if applied without substantial flexibility, the parole guidelines constitute "laws" within the meaning of the ex post facto clause.

*Geraghty* recognized both that the Parole Commission's "discretion" is severely constricted because the Commission must either follow its guidelines except for good cause or should revise the guidelines when parole decisions outside the regulations become too frequent,[23] and that the " 'channel for discretion' " under the guidelines therefore appeared to be "in actuality an unyielding conduit." Notwithstanding these observations, we did not dispose of the ex post facto question as a matter of law on the basis of the text of the guidelines and applicable statutes. Rather, *Geraghty* held that the manner in which the Commission actually applied its guidelines still constituted a question of fact. We therefore remanded the case for factfinding on this issue. 579 F.2d at 267–68 ("factual support for the plaintiff's allegations regarding the operation of the parole system must be fully developed, and the Commission should have ample opportunity to establish the authenticity of its version of the operation of the guidelines").[24]

█ The Commission again entreats us to examine the flexibility with which it in fact exercises its discretion in applying the guidelines and to hold, on that basis, that the parole guidelines cannot be deemed "laws." Forman's approach, on the other hand, obviates the need for empirical evidence, in view of the limited nature of discretion under the guidelines, and counsels in favor of adjudicating the issue on the present record. In light of the importance of the constitutional question before us, the contrary holdings of other courts of appeals, and the opinion in *Geraghty,* we believe that the most prudent course is to remand the matter so that the district court can make findings as to the role of discretion in decisionmaking under the guidelines. After making such findings and determining whether the Parole Commission does in fact act with substantial flexibility, the court will be able to decide, on the fullest possible record, whether the guidelines constitute "laws" within the meaning of the ex post facto clause.

In examining to what extent, and under what circumstances, the Commission exercises its discretion not to adhere to the guidelines, the district court will be free to rely upon statistics, affidavits, testimony, and other evidentiary sources. The court might also investigate whether the Commission allows only a given percentage of all parole decisions to deviate from the ranges prescribed by the parole guidelines before the Commission revises those guidelines to account for such deviations, *see supra* note 23.

Accordingly, we will vacate the judgment of the district court and remand the case

---

**22.** We endorse *Geraghty*'s reasoning even though that case involved pre-guidelines offenses, *see supra* note 18.

**23.** *See* H.Conf.Rep. No. 838, *supra* note 20, at 27, *reprinted in* 1976 U.S.Code Cong. & Admin. News 360 ("If decisions to go above or below parole guidelines are frequent, the Commission should reevaluate its guidelines.").

**24.** No such factfinding eventuated, however, for the district court on remand did not reach the relevant ex post facto claim. *Geraghty v. United States Parole Comm'n,* 552 F.Supp. 276, 285 n. 22 (M.D.Pa.1982), *appeal docketed,* No. 82–3593 (3d Cir. Dec. 30, 1982) ("The question of whether the guidelines are mechanically applied is not at issue in this case.").

for further proceedings consistent with the views herein expressed.

WEIS, Circuit Judge, concurring.

I join in parts I and II of the majority opinion, but write to explain why I do not join in portions of part III.

The application of the ex post facto clause to parole guidelines is an issue the Supreme Court expressly reserved in *United States Parole Commission v. Geraghty*, 445 U.S. 388, 390 n. 1, 408, 100 S.Ct. 1202, 1205 n. 1, 1214, 63 L.Ed.2d 479 (1980), and *United States v. Addonizio*, 442 U.S. 178, 184, 99 S.Ct. 2235, 2239, 60 L.Ed.2d 805 (1979). As the majority opinion recognizes, the question has divided the courts of appeals.

In touching on the merits in *Geraghty v. United States Parole Commission*, 579 F.2d 238, 267 (3d Cir.1978), *vacated and remanded on other grounds*, 445 U.S. 388, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980), we noted indications that the guidelines were not merely a "channel for discretion" but were actually an "unyielding conduit." Nevertheless, because the Commission intimated that it did in fact engage in "individualized consideration of prisoners similar to that which it undertook before the guidelines went into effect," a controverted issue of fact was presented. *Id.* We remanded for resolution of that conflict.

In *United States v. Ferri*, 652 F.2d 325 (3d Cir.1981), we reconsidered the ex post facto issue after remand from the Supreme Court in *Matthews v. United States*, 450 U.S. 962, 101 S.Ct. 1476, 67 L.Ed.2d 611 (1981), *vacating and remanding United States v. Ferri (Appeal of Matthews)*, 620 F.2d 288, 290 (3d Cir.1980) (mem.). This was the third occasion on which the Supreme Court chose not to decide the validity of the parole guidelines. We observed that the petitioner in *Ferri* had failed to allege "any arbitrary, unreasonable or nonindividualized treatment resulting in a detrimental impact or an actual denial of parole...." 652 F.2d at 328. Since he had proceeded pro se, however, and in light of the complicated evolution of the law in this area, we remanded the case to the district court. On the other hand, in *United States ex rel. Goldberg v. Warden*, 622 F.2d 60, 65 (3d Cir.), *cert. denied*, 449 U.S. 871, 101 S.Ct. 210, 66 L.Ed.2d 91 (1980), the record did demonstrate individualized treatment, thereby negating "any argument that petitioner received nothing more than a mechanical application of the parole guidelines." Consequently, we concluded that *Geraghty*'s concerns had been met in that instance.

The record in this case leaves open the questions raised in *Geraghty*, and I agree that a remand for a factual hearing is required. The district court must determine whether petitioner was subjected to a wooden application of the guidelines or instead given individualized consideration and a truly discretionary ruling by the Commission. Because that factual issue is as yet unresolved, I believe that most of the majority's extensive discussion in part III on the parole guidelines and the ex post facto clause is premature.

The constitutional issue here is a substantial one. I prefer to wait until the record is complete before expressing my views.