Timothy J. ADAMS, Petitioner-Appellant,

v.

O.J. KELLER, Commissioner and the U.S. Parole Commission, Respondents-Appellees.

No. 81–5513.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 9, 1982.

Decided June 22, 1983.

Rehearing En Banc Granted Sept. 23, 1983.*

John W. Peck, Senior Circuit Judge, filed dissenting opinion.

* Opinion vacated, see 718 F.2d 155.

Timothy J. Adams, pro se, Robert W. Willmott (argued), Lexington, Ky. (court appointed), for petitioner-appellant.

W. Hickman Ewing, Jr., U.S. Atty., W. James Ellison, Asst. U.S. Atty. (argued), Memphis, Tenn., for respondents-appellees.

Before KEITH and JONES, Circuit Judges, and PECK, Senior Circuit Judge.

KEITH, Circuit Judge.

On March 21, 1979, Appellant Timothy Joe Adams was arrested for detonating an explosive device in the Tesoro Coal Company Office Building in Hazard, Kentucky. An accountant who worked in the building was killed in the explosion. Adams' brother, Charles, was arrested at the same time, but the evidence indicated that Appellant made the bomb and placed it in the building.

On June 11, 1979, Appellant entered into a plea bargaining agreement with the United States. He entered a plea of guilty to violations of 18 U.S.C. § 844 (unlawful use of explosive materials). Because he was only twenty-one (21) years old, Appellant was committed for study and observation under the Youth Corrections Act (YCA), 18 U.S.C. § 5010(e).[1] Appellant was found to be treatable under the YCA. On September 17, 1979, Appellant was sentenced under the YCA to eighteen to twenty years in prison pursuant to 18 U.S.C. § 5010(b).[2]

Appellant remained in custody nine months before his first parole hearing. At the first examination hearing, Appellant's offense severity was classified as "Greatest II because of the death of the coal company accountant." Applying the Parol Commission's youth guidelines of 28 C.F.R. § 2.20, the examining panel concluded:

> Youth guidelines in this case would indicate a range of 50 plus months to be served before release. Due to the fact

---

1. The sentencing provision of the Youth Corrections Act is codified at 18 U.S.C. § 5010 (1976). Because of its importance to an understanding of this case, we set it out in its entirety.

**§ 5010. Sentence**

(a) If the court is of the opinion that the youth offender does not need commitment, it may suspend the imposition or execution of sentence and place the youth offender on probation.

(b) If the court shall find that a convicted person is a youth offender, and the offense is punishable by imprisonment under applicable provisions of law other than this subsection, the court may, in lieu of the penalty of imprisonment otherwise provided by law, sentence the youth offender to the custody of the Attorney General for treatment and supervision pursuant to this chapter until discharged by the Commission as provided in section 5017(c) of this chapter; or

(c) If the court shall find that the youth offender may not be able to derive maximum benefit from treatment by the Commission prior to the expiration of six years from the date of conviction it may, in lieu of the penal-

ty of imprisonment otherwise provided by law, sentence the youth offender to the custody of the Attorney General for treatment and supervision pursuant to this chapter for any further period that may be authorized by law for the offense or offenses of which he stands convicted or until discharged by the Commission as provided in section 5017(d) of this chapter.

(d) If the court shall find that the youth offender will not derive benefit from treatment under subsection (b) or (c), then the court may sentence the youth offender under any other applicable penalty provision.

(e) If the court desires additional information as to whether a youth offender will derive benefit from treatment under subsections (b) or (c) it may order that he be committed to the custody of the Attorney General for observation and study at an appropriate classification center or agency. Within sixty days from the date of the order, or such additional period as the court may grant, the Commission shall report to the court its findings.

2. *See supra* note 1.

that a life was lost as a result of this subject's behavior, the panel is making a recommendation for a 10 year reconsideration hearing with a statutory interim hearing to be scheduled in December, 1981.

Eugene Slaughter, then Administrative Hearing Examiner, disagreed with the panel's recommendation. He stated, "I believe that 10 years is excessive since there was not willful intent to cause death. In view of age and lack of sophistication, I would refer to the National Commissioners and have him serve a total of 5 years."

Parole Commissioner O.J. Keller agreed with Slaughter that the ten year sentence was too severe. But he also thought that Slaughter's recommendation was too lenient. Therefore, he sought to reconcile the two recommendations. Pursuant to 28 C.F.R. § 2.24(a), he referred Adams' case to the National Commissioners with a recommendation that Adams be given a presumptive parole date of June 6, 1981 (7 years) and that his release be conditioned upon participation in an alcoholic rehabilitation program.[3] The National Commissioners adopted this recommendation.

On January 21, 1981, Appellant filed a petition for a writ of habeas corpus and an action for damages against Commissioner Keller. The petition alleged that the Commission had extended his incarceration beyond that recommended in the Parole Commission's guidelines without adequate due process safeguards and that the Commission erred in applying the guidelines since Appellant was sentenced under the Youth Corrections Act. The complaint for damages maintained that Commissioner Keller was liable in damages for his participation in the decision. 42 U.S.C. § 1983.

On January 13, 1981, the district court dismissed that part of the action which sought damages against Commissioner Keller. On February 19, 1981, the case was referred to a United States Magistrate. The Magistrate recommended that the writ be granted. He agreed with Appellant that the Commission had misapplied its parole guidelines. He reasoned that by considering the seriousness of Appellant's offense in addition to applying a severity rating, the Commission had considered the severity of Appellant's offense twice. The Magistrate concluded that Appellant's parole date was the result of double punishment and recommended that the court "issue a writ ordering the discharge of petitioner from custody on parole, subject to special alcohol after care condition, after service of 50 months."

The district court denied the writ. He held that the Commission's guidelines for making parole decisions were reasonable and did not constitute double punishment in this case. He noted that severity classification "Greatest II" did not contain an upper limit, only a lower limit on the months to be served. Therefore, Appellant had no expectation in any set number of months to be served. In addition, the court held that the Commission did not err when it applied the Commission's guidelines to Appellant even though he was sentenced under the Youth Corrections Act. Adams perfected this appeal.

I.

On appeal, Appellant challenges the district court's rejection of each of his initial claims. He maintains that the district court erred in: 1) dismissing his claim for damages; 2) allowing the Commission to

**3.** Commissioner Keller reasoned:

While sharing Slaughter's view that the panel's recommendation for a 10 year reconsideration hearing is too severe, I believe that Slaughter is too lenient. A compromise needs to be made. In my opinion, the disparity in the handling of Adams' brother is a mitigating factor. The initial hearing summary indicates that Charles Adams is doing a 5 year term at FCI-Milan. Since he was 32 years of age at the time of the crime, and Timothy was only 21, and since Charles Adams was the individual who first contacted

Timothy to make the bomb, I believe that Charles Dwight Adams, might well have received a longer sentence. An aggravating circumstance from Timothy's viewpoint is his prior history, involving both rape and criminal attempt. The PSI also points out that he has a severe alcohol problem. While Gene Slaughter may be correct in saying that there was no willful intent to cause death, the PSI makes it clear that Timothy Adams made the bomb and then planted it in the building. In my opinion Timothy Adams should serve 7 years for this offense.

extend his time of incarceration beyond fifty (50) months; and (3) allowing the Commission to apply the guidelines to him, although he was sentenced under the Youth Corrections Act.

■ We affirm the district court's dismissal of the damages claim. There is no evidence that Commissioner Keller acted in bad faith or outside the scope of his authority as an officer of the law. To the contrary, Commissioner Keller's actions appear to be an honest attempt to reach a just result in setting a parole date for Appellant. Since there is no evidence of bad faith, recovery under 42 U.S.C. § 1983 is barred by the qualified immunity doctrine. *See Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978); *Granger v. Marek,* 583 F.2d 781 (6th Cir.1978) (Merritt, Circuit Judge, dissenting); *Taylor v. Carlson,* 671 F.2d 137 (5th Cir.1982) (*per curiam*).

## II.

Appellant does not argue that any use of the guidelines set forth at 28 C.F.R. § 2.20 is prohibited. Rather, he asserts that the Commission misapplied the guidelines in his case. He contends that he had a right to expect a presumptive parole date of fifty months and, by assessing the seriousness of his offense, the Parole Commission impermissibly seeks to extend his period of incarceration. We disagree.

■ Appellant was placed in the "Greatest II" category.[4] Youth guidelines set a presumptive parole date of fifty-plus months for offenders placed in that category. Commission guidelines clearly state, "specific upper limits are not provided at this level due to the limited number of cases and the extreme variation possible within the category." 28 C.F.R. § 2.20. We disagree with the Appellant's contention that he had a right to expect a presumptive parole date at fifty months. Due to the nature of the cases within the "Greatest II" range, the Commission has chosen to provide more individualized parole determinations. *Artez v. Mulcrone,* 673 F.2d 1169 (10th Cir.1982) (*per curiam*).

■ We also reject Appellant's contention that the Parol Commission erred when it considered aggravating circumstances beyond those factors that are a part of the Commission's guidelines. The time ranges for each category are merely guidelines. "[M]itigating or aggravating circumstances in a particular case may justify a decision or a severity rating different from that listed." 28 C.F.R. § 2.20(d). The weight to be accorded any factor relating to an individual's release is a decision to be made by the Commission. *See Allen v. United States Parole Commission,* 671 F.2d 322, 324 (9th Cir.1982); *Stroud v. United States Parole Commission,* 668 F.2d 843, 846–47 (5th Cir.1982).

■ This court must affirm the decision of the Commission to deny parole unless there has been an abuse of discretion. *See, e.g., Solomon v. Elsea,* 676 F.2d 282, 290 (7th Cir.1982); *Stroud,* 668 F.2d at 846–47; *Allen,* 671 F.2d at 324. *See generally,* 71 Georgetown L.J. 339, 708 n. 2588.[5] The Commission may consider the sophistication of the offense, *Hayward v. United States Parole Commission,* 659 F.2d 857 (8th Cir. 1981), *cert. denied,* 456 U.S. 935, 102 S.Ct. 1991, 72 L.Ed.2d 454 (1982); "evidence that existed at the time of sentencing of more serious counts which were dismissed pursuant to a plea bargain," *Page v. United States Parole Commission,* 651 F.2d 1083

---

4. The Parole Commission uses several factors in setting its parole guidelines. An inmate is given a salient factor score which represents his "parole prognosis" *indicating* the likelihood he or she will violate the terms of parole. The Commission also classifies the seriousness of the inmate's offense according to a chart listing categories of severity. The matrix of the severity rating and salient factor score provides the suggested time of incarceration. The guidelines are divided into two ranges for each ma-

trix: one for adults and the other for youth. 28 C.F.R. § 2.20 (1982).

5. The United States Supreme Court has not yet passed upon the constitutionality of the Commission's guidelines. In *United States v. Addonizio,* 442 U.S. 178, 99 S.Ct. 2235, 60 L.Ed.2d 805 (1979), the issue was presented. But the Court expressly reserved the issue of whether the guidelines were consistent with the congressional mandate of the Parole Commission and Reorganization Act of 1976.

(5th Cir.1981) (*per curiam*); or past criminal convictions, *Stroud,* 668 F.2d at 846.

■ The Commission did not abuse its discretion. It was authorized to consider each of the factors which was used to determine Appellant's parole date.[6] The initial information concerning Appellant's past criminal record was amended when new information came to the Commission's attention. The new information was reviewed and found to be more suitable for evaluation at Appellant's statutory interim hearing. Thus Appellant's argument that the Commission considered impermissible factors in setting his parole date must fail.

### III.

■ The final issue on appeal is whether the Parole Commission and Reorganization Act of 1976 (1976 Act) authorizes the Commission to treat youth offenders and adult offenders alike for purposes of making parole decisions. The Commission argues that it need only comply with the standards set forth at 18 U.S.C. § 4206 when making parole decisions for youth offenders. We disagree.

Both parties agree that an interpretation of the 1976 Act is critical to this inquiry. Before passage of this legislation, youthful offenders could be sentenced under the provisions of the Youth Corrections Act codified at 18 U.S.C. § 5010. However, if a youth was sentenced as a youthful offender, under subsection 5010(b) or (c) of the YCA, his or her release was conditioned upon a finding that the prisoner was responding well to rehabilitative treatment. The core concept underlying the legislative history of the YCA emphasized the use of the period of confinement for the education and rehabilitation of youth offenders. Once the offender was thought to be rehabilitated and ready to rejoin society, he was to be released. Often this meant that youth offenders were confined for longer periods than adults found guilty of the same offense. But this was determined to be a necessary *quid pro quo* for the youth's treatment.[7]

It was clear from the YCA that "severity of the youthful offender's crime was conspicuously absent from the factors that could be assessed in determining whether to treat or release him." *Shepard v. Taylor,* 556 F.2d 648 (2d Cir.1977). The important element of the program was that "once a person was committed for treatment under the Act, *the execution of the sentence was to fit the person not the crime for which he was convicted.*" *Dorszynski v. United States,* 418 U.S. 424, 434, 94 S.Ct. 3042, 3048, 41 L.Ed.2d 855 (1974) (emphasis added).

The 1976 Act shifted the focus for release of youth offenders. While before the 1976 Act there was no system of parole for those sentenced under the YCA, Congress amended the statute to provide that youth offenders be eligible for parole in accordance with the provisions of 18 U.S.C. § 4206. 18 U.S.C. § 4206 is a general parole provision for federal inmates. It contains three specific criteria to be used in assessing eligibility for parole: 1) that release would not depreciate the seriousness of the offense, 2) that release would not promote disrespect for the law and 3) that release would not jeopardize the public welfare.[8] *See* 71 Georgetown L.J. 706–707.

**6.** The Appellant was originally given a salient factor score of eight (8) which indicated that his parole prognosis was very good. This score, however, apparently included false information regarding a previous rape charge. The Commission was made aware of this error by a letter from the Warden at the Federal Correctional Institution in Memphis. His score was changed to 9, but no action was taken to reopen the case for special consideration. It was determined that this information could be adequately evaluated at a statutory interim hearing scheduled for December 1981.

**7.** For other judicial discussions of the Youth Corrections Act, *see Ralston v. Robinson,* 454 U.S. 201, 102 S.Ct. 233, 70 L.Ed.2d 345 (1981); *Durst v. United States,* 434 U.S. 542, 98 S.Ct. 849, 55 L.Ed.2d 14 (1978); *Dorszynski v. United States,* 418 U.S. 424, 94 S.Ct. 3042, 41 L.Ed.2d 855 (1974); *Watts v. Hadden,* 651 F.2d 1354 (10th Cir.1981); *Shepard v. Taylor,* 556 F.2d 648 (2d Cir.1977).

**8.** 18 U.S.C. § 4206 provides, in relevant part:
(a) If an eligible prisoner has substantially observed the rules of the institution or institutions to which he has been confined, and if

**1200**

We have no doubt that by making the criteria of subsection 4206(a) applicable to youth offenders, Congress was responding to the rising crime rates of youth offenders by making their confinement more in accord with general notions of punishment. Congress was concerned with notions of just punishment, retribution, and general and specific deterrence. However, neither its legislative history nor the 1976 Act itself supports the drastic result argued for by the Parole Commission.

■ It is a well-established rule of statutory interpretation that repeals by implication are disfavored. An early statement of this rule is found in *Posadas v. National City Bank,* 296 U.S. 497, 56 S.Ct. 349, 80 L.Ed. 351 (1936) where the United States Supreme Court stated,

> The cardinal rule is that repeals by implication are not favored. Where there are two acts upon the same subject, effect should be given to both if possible. There are two well-settled categories of repeals by implication—(1) where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one; and (2) if the later act covers the whole subject of the earlier one and is clearly intended as a substitute, it will operate similarly as a repeal of the earlier act. But, in either case, the intention of the legislature to repeal must be clear and manifest; otherwise, at least as a general thing, the later act is to be construed as a continuation of, and not a substitute for, the first act and will continue to speak, so far as the two acts are the same, from the time of the first enactment.

*Id.* at 503, 56 S.Ct. at 352. *See also St. Martin Evangelical Lutheran Church v. South Dakota,* 451 U.S. 772, 101 S.Ct. 2142, 68 L.Ed.2d 612 (1981) (amendment eliminating subsection 3309(b)(3) of the Federal Un-

employment Tax Act did not repeal subsection (b)(1) of the same Act where it remained unchanged and Congress evinced no intent to change its scope); *Watt v. Alaska,* 451 U.S. 259, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981) (addition of the word "minerals" to the amended Wildlife Refuge Revenue Sharing Act did not repeal by implication the Mineral Leasing Act of 1920 since there was no clear showing that this was the intent of Congress); *TVA v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) (congressional appropriations for the completion of a dam did not implicitly repeal Section 7 of the Endangered Species Act as it applied to that dam); *Morton v. Mancari,* 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974) (Title VII of the Civil Rights Act did not implicitly repeal the Indian employment preference policy provided by the Indian Reorganization Act of 1934 where there was no "clear and manifest intent" to do so).

"In the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable." *Hill,* 437 U.S. at 190, 98 S.Ct. at 2299 (quoting *Mancari,* 417 U.S. at 550, 94 S.Ct. at 2482–2483). Furthermore, the YCA concerns the parole of a specific group of offenders. The 1976 Act, on the other hand, is an act of general application. "Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment." *Mancari,* 417 U.S. at 550, 94 S.Ct. at 2483.

The legislative history of the 1976 Act is, at best, ambiguous. The YCA is amended to reflect changes in the name and nature of the agency responsible for youth parole decisions (Youth Division changed to United States Parole Commission). The 1976 Act also provides for parallel parole procedures and parallel release criteria for all federal

---

the Commission, upon consideration of the nature and circumstances of the offense and the history and characteristics of the prisoner, determines:

(1) that release would not depreciate the seriousness of his offense or promote disrespect for the law; and

(2) that release would not jeopardize the public welfare;
subject to the provisions of subsections (b) and (c) of this section, and pursuant to guidelines promulgated by the Commission pursuant to section 4203(a)(1), such prisoner shall be released.

offenders, including those sentenced under the YCA. The Commission is expressly given responsibility for decisions regarding the parole of youth offenders. *See* S.Rep. No. 369, 94th Cong., 2d Sess., 28–29, *reprinted in* 1976 U.S.Code Cong. & Ad.News 335, 350; H. Conf.Rep. No. 838, 94 Cong., 2d Sess., 3637, *reprinted in* 1976 U.S.Code Cong. & Ad.News 351, 368–69.

But we observe that the 1976 Act retained all of the YCA. As the Tenth Circuit noted in *Watts v. Hadden,* 651 F.2d 1354, 1382 (10th Cir.1981):

It is our view that these rules which prohibit implied repeals of legislation apply with even greater strength or force where the implied repeal would have to have occurred not from the enactment of an independent statute, but from revisions of portions of statutory schemes. Clearly, Congress had before it the entire Youth Corrections Act when the amendments were passed in 1976. Nevertheless, provisions which require that response to treatment be considered in setting release dates were left unaltered. Also unchanged were provisions holding that the Youth Corrections Act inmates should be considered for unconditional release following one year of parole. Indeterminate sentences, segregation, classification, individualized treatment and the goal of rehabilitation all stand unchanged.

We disagree with the Commission's argument that Congress' use of the term "parallel" in the legislative history mandates that precisely the same criteria are to be used for those sentenced under the YCA as are used for other offenders eligible for parole. Our review of the legislative history reveals no congressional manifestation of an intent to completely discard the rehabilitative underpinnings of the YCA. Moreover, we are mindful of the fact that grave constitutional concerns could arise if youth offenders, who are subject to potentially longer periods of confinement than their adult counterparts who commit the same offense, did not receive some special consideration in the terms of their confinement. *Accord: United States v. Hudson,* 667 F.2d 767, 770 (8th Cir.1982); *Watts v. Hadden,* 651 F.2d at 1365.[9]

---

**9.** Other courts have also been critical of the Commission's application of the guidelines to those sentenced under the Youth Corrections Act (YCA). The Tenth Circuit has held that the rigid approach of the Commission is inconsistent with both the Youth Corrections Act and the 1976 Parole and Reorganization Act. Accordingly, it upheld a district court judgment which directed the Commission to take certain positive actions which would bring the Federal Correctional Institute at Englewood, Colorado into compliance with the terms of the YCA, including the consideration of response to treatment as part of the parole decisions. *Watts v. Hadden,* 651 F.2d 1354 (10th Cir. 1981).

The court in *United States v. Hudson,* 667 F.2d 767 (8th Cir.1982) noted the progress being made by the Bureau of Prisons in light of *Watts.* Although it recognized that the petitioners were not receiving the benefits intended by the YCA, it found habeas relief inappropriate.

Finally, the Second Circuit has also been critical of the rigid approach of the Commission in applying the guidelines to those sentenced under the YCA. In *United States v. Jackson,* 550 F.2d 830, 832 (2d Cir.1977), the court stated:

We join with the *Cruz* [*United States v. Cruz,* 544 F.2d 1162 (2 Cir.1976) ] court's criticism of the Parole Guidelines as they are applied, apparently mechanically, to youth offenders. (citation omitted). Such application of the Guidelines is not only inconsistent with the purposes of the Act, but may also undermine the justification for the Act's indeterminate sentencing provisions. (citation omitted). But we also agree that the remedy for the inequities created by the interaction between the Guidelines and the Act rests either in administrative reform or Congressional action.

*See also Moore v. Nelson,* 611 F.2d 434 (2d Cir.1979); *United States v. Cruz,* 544 F.2d 1162 (2d Cir.1976). *But see United States v. Amidon,* 627 F.2d 1023 (9th Cir.1980); *United States v. Wallulatum,* 600 F.2d 1261 (9th Cir. 1979); *Benites v. United States Parole Commission,* 595 F.2d 518 (9th Cir.1979).

We note that the Ninth Circuit has held that a youth sentenced under the YCA cannot be sentenced to a period of confinement beyond that of an adult who commits the same offense. *Amidon* 627 F.2d at 1026. While our court has joined the Ninth Circuit's interpretation, *United States v. Hunt,* 661 F.2d 72, 75 (6th Cir.1981), it is clear that not every court shares our view. *See, e.g., Hudson,* 667 F.2d at 770; *Watts,* 651 at 1365. Moreover, the Supreme Court's recent opinion in *Ralston v. Robinson,* 454 U.S. at 206 n. 3, 102 S.Ct. at 238 n. 3, appears to leave the question open to debate. In any case, until Congress definitively resolves this issue,

Our court must read the statutes to give effect to both if at all possible. *Watts v. Alaska,* 451 U.S. at 267, 101 S.Ct. at 1678; *Mancari,* 417 U.S. at 551, 94 S.Ct. at 2483. We agree with the Tenth Circuit's holding in *Watts* that the YCA and the latter 1976 Parole Commission and Reorganization Act can be harmonized only if the Commission considers a youth offender's response to treatment as well as the parole criteria of 18 U.S.C. § 4206(a). While subsection 4206(a) *allows* the Commission to consider response to treatment when making parole decisions for adults, the YCA *mandates* that response to treatment be an integral part of the release criteria for youth offenders. Since we can find no implicit repeal of the rehabilitative nature of the YCA, "its underlying purposes are not to be discarded, evaded or ignored by the Bureau of Prisons." *Hudson,* 667 F.2d at 770.

Since the Parole Commission failed to consider Appellant's response to rehabilitation, we remand to the district court with instructions to allow the Commission to grant appellant a new parole hearing. If the new hearing has not taken place within a reasonable time, the writ of habeas corpus should be granted.

JOHN W. PECK, Senior Circuit Judge, dissenting.

I respectfully disagree with the majority opinion, being of the view that it is inconsistent with the strong mandate of Congress expressed in the 1976 amendment to the Federal Youth Corrections Act (YCA).

Section 7 of the Parole Commission and Reorganization Act of 1976, Pub.L. No. 94–233, 90 Stat. 232 altered the standards and criteria for determining release dates for youthful offenders. It specifically amended § 5017(a) of YCA, and mandated that the criteria of 18 U.S.C. § 4206 be applied to all youthful offenders. See footnote 8, majority opinion. Courts have uniformly held, and the majority agrees, that the 1976 amendment now directs the Parole Commission's attention from rehabilitation considerations to an analysis of the seriousness of the offense committed in calculating a release date. Majority opinion at 1199–1200; *Marshall v. Garrison,* 659 F.2d 440, 443–44 (4th Cir.1981); *United States v. Wallulatum,* 600 F.2d 1261, 1262 (9th Cir. 1979); *Benites v. United States Parole Comm'n,* 595 F.2d 518, 520–21 (9th Cir. 1979). In so doing the plain Congressional purpose was to develop uniform standards and criteria for calculations of parole release dates for all federal prisoners. *See* S.Rep. No. 369 *reprinted in* 1976 U.S.Code Cong. & Ad.News 335, 339–40, 350 (amendment is to equate and parallel release criteria for all federal prisoners without regard to means of sentencing); *Marshall v. Garrison,* 659 F.2d at 443–44.

Applying these new criteria, the Parole Commission analyzed the circumstances of Adams' case, taking into account the seriousness of the crime committed and his past history, including the fact he had been sentenced under the YCA. As a result, it elected to apply its youth guidelines to Adams and set a presumptive release date. It left open the possibility of an earlier release date, by establishing an interim parole review in December, 1981 when another consideration under 18 U.S.C. § 4206 would occur. Overall the Parole Commission scrupulously applied all release criteria required by § 5017(a) and enumerated in § 4206.

The majority, however, would ignore the passage of the 1976 amendment and continue to require the Parole Commission to calculate release dates substantially on the offender's response to treatment. Certainly, while the Parole Commission may consider such a factor, and, in this case arguably did, it is no longer required to do so.[1]

we must attempt to construe this legislation, "if fairly possible, to avoid raising doubts of its constitutionality." *St. Martin Lutheran Evangelical Church v. South Dakota,* 451 U.S. 772, 780, 101 S.Ct. 2142, 2147, 68 L.Ed.2d 612 (1981).

1. The Parole Commission provided for an interim parole review in December, 1981. It also conditioned Adams' release on his successful completion of an alcoholic treatment program. The Commission implicitly included such considerations in its decision, within its discretion, to apply its youth guidelines rather than its adult guidelines under 28 C.F.R. § 2.20.

In sum, the Parole Commission did consider appellant Adams' response to treatment in this case, and treated him as a youthful offender, even though it was not required to do so. I therefore cannot concur in the majority's opinion requiring the Parole Commission to reopen appellant's parole hearing.[2] I would affirm the district court and deny the writ of habeas corpus.

2. The majority suggests this interpretation of the 1976 amendment to YCA might pose serious constitutional issues. Since such issues were not raised in this case, however, it is premature to address them at this time.