**Timothy J. ADAMS,
Petitioner-Appellant,**

v.

**O.J. KELLER, Commissioner and the
U.S. Parole Commission,
Respondents-Appellees.**

No. 81–5513.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 16, 1984.

Decided May 29, 1984.

---

Timothy J. Adams, pro se.

Robert W. Willmott (argued), Lexington, Ky., for petitioner-appellant.

W. Hickman Ewing, Jr., U.S. Atty., W. James Ellison, Asst. U.S. Atty., Memphis, Tenn., Patrick J. Glynn (argued), U.S. Parole Com'n, Chevy Chase, Md., for respondents-appellees.

Before LIVELY, Chief Judge, EDWARDS, ENGEL, KEITH, MERRITT, KENNEDY, MARTIN, JONES, CONTIE, KRUPANSKY and WELLFORD, Circuit Judges, and JOHN W. PECK, Senior Circuit Judge.

JOHN W. PECK, Senior Circuit Judge.

On March 21, 1979, Timothy J. Adams was arrested for detonating an explosive device in the Tesoro Coal Company Office Building in Hazard, Kentucky. As a result of the explosion an accountant working late in the building was killed. Adams pled guilty to a charge of unlawful use of explosive materials in violation of 18 U.S.C. § 844. The district judge, aware that Adams was twenty-one years of age, but concerned that a maximum six-year sentence was inappropriate in light of the seriousness of the offense committed by Adams, with an accompanying death resulting from the crime, recommended Adams for study and observation for possible consideration as a youthful offender under the federal Youth Corrections Act (YCA or the Act), 18 U.S.C. § 5010(e). After it was determined that Adams was treatable as a youth offender under the YCA, the district judge, on September 17, 1979, sentenced him to 18 to 20 years under § 5010(c) of the YCA. At his initial parole hearing, held nine months after sentencing, a panel of the Parole Commission classified Adams as a "Greatest II offender," based on the severity of his offense and the fact that an individual was killed. At the same time, Adams was given a salient factor score of 8, indicating that his prognosis for release on parole was good.[1] Applying its parole guidelines for youthful offenders, 28 C.F.R. § 2.20 *et seq.*, the panel concluded that Adams should serve a minimum of fifty plus months of his sentence, and, since a life was lost due to his offense, recommended that a presumptive parole date for Adams be set ten years into his sentence. The panel also recommended that Adams receive an interim administrative review and reconsideration in June, 1981. Administrative Hearing Examiner Gene Slaughter disagreed with the recommendations of the panel stating that since the Pre-Sentence Information Report did not indicate willful intent to cause death, the ten-year sentence was excessive. He urged the Parole Commission to adopt a shorter five-year sentence. On review, O.J.

---

1. Adams's salient factor score was subsequently changed to 9 and his minimum sentence reduced to 40 plus months, correcting an inadvertent oversight by the Parole Commission. *See* note 3 *infra.*

Keller, the Regional Parole Commissioner, urged the National Parole Commission to adopt a compromise seven-year sentence with a presumptive parole date of June 6, 1986, conditioned on Adams successfully completing an alcoholic treatment and rehabilitation program. Keller declared that a ten-year sentence was excessive, but that Adams's situation was aggravated by prior rape and criminal attempt charges, and the fact that he had constructed the bomb. The National Parole Commission adopted this recommendation.

On January 2, 1981, Adams sought habeas corpus relief in the federal district court alleging the parole commission had unlawfully extended his incarceration beyond that provided for in the Parole Guidelines in violation of his due process right under the United States Constitution. He further contended that the Parole Commission had misapplied its guidelines for youthful offenders in his case by failing to consider his response to treatment in its determination of his presumptive parole date. In a concurrent action, Adams filed a suit against Keller seeking damages alleging, in addition to a fifth amendment violation, that Keller had libelled him by making false and malicious statements in his recommendation. The district court, after carefully considering both suits, dismissed.

On appeal a panel of this court affirmed dismissal of claims against Keller. *Adams v. Keller*, 713 F.2d 1195, 1198 (6th Cir. 1983). At the same time, however, it found that the Parole Commission, by failing to consider rehabilitation and treatment in setting a parole date for Adams, had violated the YCA. *Id.* at 1199. The court ordered the Parole Commission to reconsider Adams's conditional parole date, incorporating an analysis of his response to treatment and his institutional performance and rehabilitation as required by the purpose and spirit of the YCA. *Id.* at 1202.

The Parole Commission thereafter petitioned this court for a rehearing according to Fed.R.App.P. 40, and appended a suggestion for rehearing en banc pursuant to Fed.R.App.P. 35. The court granted the request for rehearing and directed the case to be heard en banc. 718 F.2d 155 (6th Cir.1983). The effect of this action was "to vacate the previous opinion and judgment of this court, to stay the mandate and to restore the case on the docket as a pending appeal." 6th Cir.R. 14(a). The parties thereafter filed supplemental briefs and additional arguments were heard. Adams reasserted his argument that his suit against Keller was improperly dismissed. In addition, he argued that this court should grant him habeas corpus relief since (1) the Parole Commission had improperly extended his sentence beyond the minimum prescribed by the parole guidelines for youthful offenders; (2) the Parole Commission misapplied its guidelines to him; and (3) the Parole Commission failed to consider his response to treatment in determining his presumptive parole date. After reviewing each of these contentions, we find them to be without merit and affirm the district court opinion *in toto*.

At this point, however, we emphasize the fact that by intervening supplementation of the record, circumstances not known to the original hearing panel are now before the court. The Parole Commission considered Adams's response to treatment and institutional performance in changing his presumptive parole date from June 6, 1986 to June 8, 1984. *See* National Appeals Board Finding and Conclusions and Notice of Action on Appeal of July 30, 1982. Keller, in his recommendation, declared that while Adams's institutional performance was good and that Adams had responded well to his treatment program, the severity of his offense still warranted completion by Adams of at least a sixty-month sentence before release on parole. Dorothy Parker, also a member of the Parole Commission, concurred along similar lines. While such an explicit statement concerning a youthful offender's response to treatment and institutional performance is no longer mandated by the YCA, as we shall discuss *infra*, we encourage such precise analyses by the Parole Commission in future parole decisions.

Appellant Adams initially argues that the district court improperly dismissed his suit for damages against Commissioner Keller. He alleges that Keller deliberately relied on the Pre-Sentence Information Report, although he in fact knew or should have known that it inaccurately stated that Adams had a prior criminal record and that he had constructed the bomb. Keller maliciously recommended his sentence extended to seven years, Adams concludes, and is therefore liable in damages. We disagree.

There is nothing in the record to indicate Keller did anything outside his authority or failed to act in good faith. In our view, Keller simply made an honest attempt to reach a fair and just result. His reliance on the written record before him was reasonable. Adams presents no evidence to support his allegations of lack of good faith or malicious intent by Keller. In fact, when the errors were pointed out to him at the behest of Adams, Keller immediately recommended that the sentence be reduced to five years based on the fact that Adams did not have a prior criminal record and that he had not constructed the bomb. We conclude, therefore, that the action is at least barred by qualified immunity in this case. *Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978); *Taylor v. Carlson,* 671 F.2d 137 (5th Cir.1982) (per curiam).[2]

Adams next contends the Parole Commission deprived him of due process when it impermissibly extended his term of incarceration beyond the minimum sentence prescribed by the parole guidelines for youthful offenders and impermissibly considered aggravating circumstances associated with his offense in so doing. We find these contentions without merit.[3]

The parole guidelines of 28 C.F.R. § 2.20 *et seq.,* interpreting the Parole Commission and Reorganization Act of 1976 (PCRA), 18 U.S.C. § 4201 *et seq.,* establish a method for calculating a prisoner's parole release date based on the severity of his offense, his prognosis for a successful parole, and his overall institutional performance. The guidelines provide parallel ranges of sentences for both adult and youthful offenders, setting forth flexible guidelines permitting a degree of individualized consideration for each prisoner. In this case, the Parole Commission assigned Adams a salient factor score of 9, reflecting the fact that his prognosis for a successful parole was quite good, and rated his offense in the Greatest II category, reflecting the severity of his crime. Applying these factors to the youthful offender category of 28 C.F.R. § 2.20, Adams was placed in the classification of forty plus months of incarceration before a possible parole. Unlike many of the other classifications, however, Greatest II has no upper limit, allowing the Parole Commission certain latitude in extending the sentence in the case of an especially severe offense.

Accompanying text to the Greatest II classification states that "[s]pecific upper limits are not provided due to the limited number of cases and the extreme variation possible within category." 28 C.F.R. § 2.20. Given this inherent flexibility in the guideline for the Greatest II offender, we find no merit in the claim by Adams that he "expected" release on parole after

---

**2.** Since the record in this case is totally devoid of evidence indicating wrongdoing by Keller we need not reach the issue of whether Keller is entitled to absolute immunity. *Butz v. Economou,* 438 U.S. 478, 512–13, 98 S.Ct. 2894, 2913–14, 57 L.Ed.2d 895 (1978); *Evans v. Dillahunty,* 711 F.2d 828, 830–31 (8th Cir.1983).

**3.** Adams concurrently argues that the Parole Commission erred in computing his salient factor score as 8, rather than 9, resulting in severe prejudice to him. The salient factor score was, he asserts, based in part on misinformation in the pre-sentencing report concerning a prior

criminal record and the fact that he had constructed the bomb. In using a score of 8 rather than the correct score of 9, Adams continues, the Parole Commission incorrectly assigned him a minimum sentence of fifty plus months rather than forty plus months of incarceration. This error, however, was corrected by the Parole Commission in its Notice of Action of July 30, 1982, without prejudice having occurred to Adams. He was assigned a salient factor score of 9, and a new minimum sentence reference point of forty plus months.

forty months of incarceration. *Artez v. Mulcrone,* 673 F.2d 1169 (10th Cir.1982) (per curiam).

■ At the same time we reject the argument that the Parole Commission was foreclosed from considering aggravating circumstances of this offense, including the death of the accountant, in deciding to extend the sentence beyond forty plus months. The determination of whether to grant an inmate parole is explicitly left to the Parole Commission in this situation. 18 U.S.C. § 4206; *Allen v. United States Parole Comm'n,* 671 F.2d 322, 324 (9th Cir. 1982); *Stroud v. United States Parole Comm'n,* 668 F.2d 843, 846–47 (5th Cir. 1982). Our review must concentrate solely on whether the Parole Commission abused its discretion in setting the parole date. *Solomon v. Elsea,* 676 F.2d 282, 290 (7th Cir.1982) (per curiam); *Stroud, supra; Allen, supra;* 71 Geo.L.J. 339, 708 & n. 2588 (1982). Courts have permitted a variety of reasons proffered by the Parole Commission for setting the presumptive parole date beyond those prescribed in the parole guidelines. *See Stroud, supra* (past criminal record); *Hayward v. United States Parole Comm'n,* 659 F.2d 857 (8th Cir.1981) (sophistication of offense), *cert. denied,* 456 U.S. 935, 102 S.Ct. 1991, 72 L.Ed.2d 454 (1982); *Page v. United States Parole Comm'n,* 651 F.2d 1083, 1086 (5th Cir.1981) (per curiam) (serious counts dropped during plea bargaining). We conclude that the Parole Commission did not abuse its discretion by considering the unfortunate death of the accountant as a factor requiring Adams to serve longer than the minimum time for his offense.

The final issue raised by appellant Adams is whether the Parole Commission, by failing to consider his response to treatment and rehabilitation in setting his presumptive parole date, violated the YCA. In particular, Adams asserts, the YCA requires that youthful offenders be considered individually in parole decisions, and stipulates that such consideration must include an analysis of the youthful offender's institutional performance and his response to treatment. Since his response to rehabilitation and his institutional performance were not considered, Adams concludes, he is entitled to receive a new parole hearing at which these factors will be considered.

The overall congressional purpose of the original YCA, enacted in 1950, was to treat the youthful offender differently in all respects. The predominant theme of the Act was that youthful offenders could and should receive special rehabilitation and training as well as be deterred from future crimes by imprisonment or other forms of governmental supervision. As a result, the Act required both special rehabilitation training and educational opportunities (18 U.S.C. § 5011) and segregated housing for inmates (18 U.S.C. §§ 5012 & 5013), and even provided for setting aside convictions of youthful offenders by court order, permitting them to have a clean record once they had been properly treated (18 U.S.C. § 5021). As originally enacted by Congress, § 5017(a) provided that youthful offenders would be released on parole when the Director of the Board of Paroles (predecessor to the Parole Commission) deemed appropriate.[4] Courts, construing this lan-

4. The text of 18 U.S.C. § 5017 originally read:

(a) The Division may at any time after reasonable notice to the Director release conditionally under supervision a committed youth offender. When, in the judgment of the Director, a committed youth offender should be released conditionally under supervision he shall so report and recommend to the Division.

(b) The Division may discharge a committed youth offender unconditionally at the expiration of one year from the date of conditional release.

(c) A youth offender committed under section 5010(b) of this chapter shall be released conditionally under supervision on or before the expiration of four years from the date of his conviction and shall be discharged unconditionally on or before six years from the date of his conviction.

(d) A youth offender committed under section 5010(c) of this chapter shall be released conditionally under supervision not later than two years before the expiration of the term imposed by the court. He may be discharged unconditionally at the expiration of not less than one year from the date of his conditional

guage, have uniformly required that such parole decisions be based solely on the youthful offender's response to treatment and his institutional progress. *Benites v. United States Parole Comm'n*, 595 F.2d 518 (9th Cir.1979); *De Peralta v. Garrison*, 575 F.2d 749 (9th Cir.1978); *Shepard v. Taylor*, 556 F.2d 648 (2d Cir.1977).

An early problem in determining parole release dates, however, was the YCA's total lack of standards for making such decisions. In 1976 Congress enacted the PCRA in order to bring more organization and uniformity to the parole process. Among its many provisions, the PCRA amended § 5017(a) of the YCA, incorporating the parole procedures of 18 U.S.C. § 4206, the method for paroling all federal offenders. By that amendment, Congress altered the focus of parole decisions for youthful offenders by mandating that the Parole Commission no longer follow the traditional parole procedures of the YCA, but rather follow parole criteria provided for all federal offenders. *Marshall v. Garrison*, 659 F.2d 440, 443 (4th Cir.1981); *Shepard, supra; Robinson v. Hanberry*, 442 F.Supp. 933, 934–35 (E.D.Mich.1977), *aff'd mem.*, 573 F.2d 1311 (6th Cir.1977). Section 4206(a) unambiguously states:

(a) If an eligible prisoner has substantially observed the rules of the institution or institutions to which he has been confined, and if the Commission, upon consideration of the nature and circumstances of the offense and the history and characteristics of the prisoner, determines:

(1) that release would not depreciate the seriousness of his offense or promote disrespect for the law; and

(2) that release would not jeopardize the public welfare;

subject to the provisions of subsections (b) and (c) of this section, and pursuant to guidelines promulgated by the Commission pursuant to section 4203(a)(1), such prisoner shall be released.

The legislative history of the PCRA makes it clear that Congress intended that the Parole Commission apply uniform standards or "parallel" methods of paroling all federal offenders irrespective of their status as youthful offenders. S.Rep. No. 369, 94th Cong., 2d Sess., 18, 29, *reprinted in* 1976 U.S.Code Cong. & Ad.News 335, 339–40, 350; *Marshall, supra,* 659 F.2d at 443, 444; *Benites, supra,* 595 F.2d at 520; *Shepard, supra,* 556 F.2d at 653.

In the wake of the PCRA, the Parole Commission promulgated guidelines designed to implement the new standards, directed by Congress, for youthful offenders. 28 C.F.R. § 2.20 *et seq.* Under this approach the severity of a prisoner's offense is considered as well as his prognosis for a successful parole. At the same time the guidelines for both youthful and adult offenders incorporate provisions for evaluation of a prisoner's institutional and program performance. General Note A, accompanying the parole guidelines, states unequivocally that "[t]hese guidelines are predicated upon *good institutional conduct* and *program performance.*" 28 C.F.R. § 2.20, General Note A (emphasis added). As a result, while a youthful offender's institutional performance and response to treatment need not be considered on an individual, case-by-case basis, these factors are incorporated in the Parole Commission guidelines. Inherent in the computation of each minimum sentence is the presumption that the youthful offender satisfactorily responded to treatment and rehabilitation, a presumption that can only be altered by explicit statements by the Parole Commission. At the same time, however, the period of incarceration for a youthful offender can, despite a good response to treatment be extended by aggravating circumstances. On the other hand, § 4206(c)

release. He shall be discharged unconditionally on or before the expiration of the maximum sentence imposed, computed uninterruptedly from the date of conviction.

(e) Commutation of sentence authorized by any Act of Congress shall not be granted as a matter of right to committed youth offenders but only in accordance with rules prescribed by the Director with the approval of the Division.

would permit the Parole Commission to reduce a youthful offender's sentence below the minimum sentence suggested by the guidelines, where otherwise statutorily permitted, in the case of a youthful offender who had responded excellently to treatment and performed extraordinarily during incarceration.

■ We find the parole guidelines for youthful offenders to be congruent with the congressional purpose of amending § 5017(a) of the YCA. This construction, we think, furthers the congressional purpose of bringing added uniformity in parole decisions by no longer mandating that the Parole Commission consider rehabilitation and response to treatment in each and every case, while still permitting the Parole Commission discretion to consider these factors in the unusual situation.[5]

■ In this case the Parole Commission classified Adams as a "Greatest II offender", with a salient factor score of 9. These computations required Adams to serve a minimum of forty plus months, according to the parole guidelines, on the condition that Adams would properly respond to treatment and have a good institutional performance record during that time. In setting his sentence the Parole Commission extended Adams's sentence beyond the minimum because of the severity of his offense, but subsequently reduced his sentence in part due to his exceptional institutional performance and response to treatment, all within its discretion. We conclude, therefore, that Adams received proper consideration by the Parole Commission, and that the Parole Commission considered all the elements mandated by § 4206 in reaching its decision. We therefore affirm the district court's denial of habeas corpus relief in this case.

Affirmed.

KEITH, Circuit Judge, with whom Chief Judge LIVELY, and Judges GEORGE CLIFTON EDWARDS and NATHANIEL R. JONES join, dissenting.

We respectfully dissent. The majority takes the position that the Youth Corrections Act (YCA), 18 U.S.C. § 5010, has been implicitly repealed by the Parole Commission and Reorganization Act of 1976 (PCRA), 18 U.S.C. § 4206. It asserts that "Congress altered the focus of parole decisions for youthful offenders by mandating that the Parole Commission no longer follow the traditional parole procedures of the YCA, but rather follow parole criteria provided for all federal offenders." Op. at 8. The majority continues by stating that "the legislative history of the PCRA makes it clear that Congress intended that the Parole Commission apply uniform standards or parallel methods of paroling all offenders irrespective of their status as youthful offenders." Op. at 9. We cannot agree with this interpretation of the PCRA. This interpretation is so clearly contrary to the YCA that it eviscerates the purposes for which it was enacted.

In reviewing the legislative history of the YCA, it is clear that Congress was motivated by two primary factors in promulgating the Act. First, it was recognized that the period of life between the ages of sixteen and twenty-two was the time "when special factors operated to produce habitual criminals." Second, then-existing methods of treating criminally inclined youths were found inadequate in avoiding recidivism. H.R.Rep. No. 2979, 81st Cong., 2nd Sess. *reprinted in* 1950 U.S.Code Cong. & Ad. News 3983. To this end, the YCA was designed to provide a better method for treating young offenders convicted in federal courts. Of particular emphasis was the vulnerable age bracket, with the goal to rehabilitate and restore normal behavior patterns. *Dorszynski v. United States,*

5. To the extent the decision in *Watts v. Hadden,* 651 F.2d 1354 (10th Cir.), *reh'g denied,* 686 F.2d 841 (10th Cir.1981), might require more of an inquiry into a youthful offender's response to treatment and rehabilitation we find the clear and unambiguous intent of Congress, by amend-

ing § 5017(a) of the YCA mandating parole decisions be determined according to § 4206, rendered such scrutiny unnecessary. *Marshall, supra; Benites, supra; Shepard, supra; Hanberry, supra.*

418 U.S. 424, 433, 94 S.Ct. 3042, 3048, 41 L.Ed.2d 855 (1973).

The YCA provides that all offenders under the age of twenty-two years at the time of conviction are eligible for probation or treatment under the Act. It defines treatment as "corrective and preventive guidance and training". 18 U.S.C. § 5006(e). An important element of the program was that once a person was committed for treatment, the execution of the sentence was to fit the person, not the crime for which he was convicted. 18 U.S.C. §§ 5014, 5015. Further, the Director of the Bureau of Prisons (predecessor to Parole Commission) was authorized both to adopt numerous public facilities, and to contract with public or private agencies, in order to provide institutional treatment which could be varied according to the person's progress or lack thereof. 18 U.S.C. §§ 5011, 5015. An integral part of the treatment program was the segregation of committed persons, placing them with those similarly committed to avoid the influence of association with the more hardened inmates serving traditional criminal sentences. 18 U.S.C. § 5011. In addition, once the offenders had been properly treated, an unconditional release could be granted with an expunction of the offender's record. 18 U.S.C. § 5021.

It is clear from these YCA provisions that Congress mandated that response to treatment was to be a primary concern in the parole decision process of a youth offender. The courts have long recognized this mandate, of rehabilitating and restoring normal behavior patterns, in the sentencing of youth. *Dorszynski v. United States, supra; United States v. Hunt,* 661 F.2d 72 (6th Cir.1981); *Benites v. United States Parole Commission,* 595 F.2d 518 (9th Cir.1979); *United States v. Hopkins,* 531 F.2d 576 (D.C.Cir.1976).

The majority has erred in interpreting the PCRA as repealing the response to treatment provisions of the YCA. It bases this position on the legislative history of the PCRA. At best, the legislative history of the PCRA is ambiguous. The YCA was amended to reflect changes in the name and nature of the agency responsible for youth parole decisions; to provide for parallel parole procedures and release criteria for all offenders, including those sentenced under the YCA; and to expressly give the Commission responsibility for decisions regarding the parole of youth offenders. *See* S.Rep. No. 369, 94th Cong., 2d Sess., 28–29 *reprinted in* 1976 U.S.Code Cong. & Ad. News 335, 350.

However, it is beyond peradventure that the PCRA retained all of the provisions of the YCA. As the Tenth Circuit noted in *Watts v. Hadden,* 651 F.2d 1354, 1382 (10th Cir.1981):

It is our view that these rules which prohibit implied repeals of legislation apply with even greater strength or force where the implied repeal would have to have occurred not from the enactment of an independent statute, but from revisions of portions of statutory schemes. Clearly, Congress had before it the entire Youth Corrections Act when the amendments were passed in 1976. *Nevertheless, provisions which require that response to treatment be considered in setting release dates were left unaltered.* Also unchanged were provisions holding that the Youth Corrections Act inmates should be considered for unconditional release following one year of parole. Indeterminate sentences, segregation, classification, individual treatment and the goal of rehabilitation all stand unchanged. *Id.* at 1382 (emphasis supplied).

Furthermore, a fundamental tenet of statutory construction is that repeals by implication are strongly disfavored. *Blanchette v. Connecticut General Insurance Corp.,* 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974). Absent an implicit expression to the contrary, the statutory provisions at issue must be read harmoniously. *See Watt v. Alaska,* 451 U.S. 259, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981). A review of the legislative history of the PCRA reveals no Congressional manifestation of an intent

**328**

to completely disregard the rehabilitative underpinnings of the YCA.

Moreover, we disagree with the majority in its characterization that the term "parallel" mandates that precisely the same criteria which are used for other offenders, are also to be used for those sentenced under the YCA. We agree with the Tenth Circuit's holding in *Watts v. Hadden, supra,* that the YCA and the later PCRA can be harmonized only if the Commission considers a youth offender's response to treatment as well as the parole criteria of 18 U.S.C. § 4206(a). While 4206(a) *allows* the Commission to consider response to treatment when making parole decisions for adults, the YCA *mandates* that response to treatment be an integral part of the release criteria for youth offenders. Additionally, it requires the Commission to consider the fact that the youth offender was, in fact, sentenced as a youth offender, and that the policies and purposes of the YCA should be applied to the parole considerations.

We are compelled to dissent from the majority's position that the rehabilitative treatment policies no longer need be considered when making parole decisions regarding youthful offenders. Such a position is antithetical to the very purposes and goals of Congress in promulgating the YCA.

The Congressional mandate was to treat youthful offenders differently, and by providing educational and rehabilitative measures, prevent the offenders from becoming habitual criminals. Pursuant to the YCA, the institutional performance and response to treatment are the primary criteria in determining parole release. *Benites v. United States Parole Commission,* 595 F.2d 518 (9th Cir.1979). A reading of the legislative history of the PCRA does not evince that Congress has retreated from this mandate. Surely, if Congress had made such a fundamental change in this mandate it would have provided express provisions indicating this new position. Therefore, in the absence of an express provision, the response to treatment factor

remains valid and a primary consideration in the parole process of youthful offenders.

The majority opinion condones an unnecessary and improper deviation from the Congressional mandate. Accordingly, we would reverse the district court and grant the habeas petition.